**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Leo V. Leyva, Esq.
James T. Kim, Esq.
Attorneys for PRIF II Chemtek, LLC and P II River Vale GC Funding, LLC

|  |  |
|---|---|
| In re:<br><br>CHEMITEK 2006, LLC,<br><br>Debtor-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASE NO.  10-13393 (DHS)<br><br>Chapter 11<br><br>**HEARING DATE AND TIME:**<br>February ___, 2010 at ___:___ __.m.<br><br>**ORAL ARGUMENT REQUESTED** |

**AFFIDAVIT OF DAVID MCLAIN IN SUPPORT OF PRIF II CHEMTEK, LLC AND P II RIVER VALE GC FUNDING, LLC'S MOTION FOR ENTRY OF AN ORDER (A) DISMISSING THE DEBTORS' CHAPTER 11 PETITIONS PURSUANT TO 11 U.S.C. § 1112(b) OR ALTERNATIVELY, (B) GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d); (C) EXCUSING RECEIVER FROM COMPLIANCE UNDER 11 U.S.C. § 543(d); AND (D) PROHIBITING, TO THE EXTENT APPLICABLE, THE DEBTORS FROM USE OF CASH COLLATERAL <u>PURSUANT TO 11 U.S.C. § 363(c)(2) AND (e)</u>**

STATE OF NEW JERSEY    )
                       ) ss.
COUNTY OF BERGEN       )

DAVID MCLAIN, of full age, being duly sworn according to law, under penalty of perjury, hereby affirms as follows:

42952/0017-6223267v1

1.  I am the manager of PRIF II Chemtek, LLC ("PRIF") and the manager of P II River Vale GC Funding, LLC ("P II" which, together with PRIF, are collectively referred to herein as the "Mortgagees"). I possess personal knowledge of the facts set forth herein and submit this Affidavit in support of the Mortgagees' motion for an Order: (a) dismissing the Chapter 11 petitions of Chemitek 2006 LLC ("Chemitek") and Palisades Park Plaza North, Inc. ("Palisades Park" which, together with Chemitek, are collectively referred to herein as the "Debtors") or, alternatively, (b) granting relief from the automatic stay provisions of Section 362(d) of the Bankruptcy Code; (c) excusing compliance of receiver Stephen Sinisi, Esq. (the "Receiver"), under Section 543(d) of the Bankruptcy Code; and (d) prohibiting, to the extent applicable, the Debtors from using Mortgagees' cash collateral pursuant to Sections 363(c)(2) and (e) of the Bankruptcy Code.

## INTRODUCTION

2.  This dispute arises from two (2) separate judicial foreclosure proceedings against the Debtors. It is those foreclosure proceedings which precipitated the bad faith filings by Debtors as a means to stonewall and delay the exercise of the Mortgagees' unequivocal right to foreclose.

3.  The impropriety of the Debtors' Chapter 11 petitions is most evident from the timing of these proceedings. The Debtors filed their Chapter 11 petitions a few hours before the subject property was scheduled for a Sheriff's sale. Against this background of untoward conduct, and considering these filings were precipitated by what is essentially a two-party dispute, the Mortgagees respectfully request that this Court exercise its discretion and dismiss the Debtors' Chapter 11 petitions as bad faith filings pursuant to 11 U.S.C. § 1112(b).

4.  In the event this Court is not inclined to dismiss the Debtors' bankruptcy petitions, at a minimum, cause exists to lift the automatic stay pursuant to 11 U.S.C. § 362(d),

2

permitting the Mortgagees to proceed with the foreclosure and sale of the mortgaged property. Absent this relief, the Mortgagees' security interest in the mortgaged property, which has already been materially diminished by the recent credit crisis and collapse in the real estate market, will be placed in further jeopardy. As demonstrated in detail below, the outstanding mortgage debt is **$21,132,339.27** (as of February 1, 2010), which well exceeds the value of the mortgaged property. This deficiency will only continue to increase unless the Mortgagees are permitted to expeditiously proceed with their foreclosure and pursue a sale of the property at public auction.

5.  The Mortgagees also respectfully request the Court excuse the Receiver, which was appointed by the state court in connection with the PRIF Foreclosure Action (defined herein), from compliance under Section 543(d) of the Bankruptcy Code and prohibiting, to the extent applicable, the Debtors from using the Mortgagees' cash collateral, namely rents and income, pursuant to Sections 363(c)(2) and (e) of the Bankruptcy Code. Relief is especially appropriate considering that the Mortgagees possess an absolute assignment of leases and rents under the applicable loan documents, which entitles the Mortgagees to all income generated from the mortgaged premises. The Receiver has adequately and responsibly managed the mortgaged premises, having maintained the value of the property during the pendency of the foreclosure proceedings.

**BACKGROUND**

6.  The Debtors' primary asset consists of real properties commonly known as 660 Rivervale Road, River Vale, New Jersey (the "Golf Course Property") and 650, 654, 644 and 634 Rivervale Road, River Vale, New Jersey (the "Development Property" which, together with the Development Property are collectively referred to as the "Mortgaged Premises"). The Debtors operate the Golf Course Property as a golf course known as River Vale Country Club.

7.     As set forth in detail herein, the Mortgagees each possess mortgages on the Mortgaged Premises, which secure the Debtors' substantial indebtedness pursuant to binding commercial loan documents.

### A.     **The Debtors' Pre-Petition Indebtedness To P II And Default Under The P II Loan Documents.**

#### 1.     **The P II Loan Documents.**

8.     On November 1, 2006, Oritani Bank, formerly known as Oritani Savings Bank ("Oritani"), provided a loan to the Debtors in the original principal amount of $9,000,000 as evidenced by a Mortgage Note (the "P II Note").[1]  (A true copy of the P II Note is attached as **Exhibit A**.)  Pursuant to the P II Note, the Debtors promised to pay Oritani all sums due and owing together with accrued interest by November 1, 2016.  The P II Note obligates the Debtors to pay monthly interest payments to Oritani at the rate of seven and one half (7.5%) percent (See P II Note, Exhibit A, p. 3).

9.     To secure their obligations under the P II Note, the Debtors executed a Mortgage and Security Agreement dated November 1, 2006 (the "P II Mortgage") granting Oritani a first mortgage lien on the Golf Course Property.  (A true copy of the P II Mortgage is attached as **Exhibit B**.)  The P II Mortgage was recorded in the Bergen County Clerk's Office on November 14, 2006, in Mortgage Book 16381, Page 304.

10.     To further secure their obligations under the P II Note, the Debtors executed a Mortgage and Security Agreement dated November 1, 2006 (the "P II Development Mortgage") granting Oritani a mortgage lien on the Development Property subordinate to PRIF's first mortgage. (A true copy of the P II Development Mortgage is attached as **Exhibit C**.)  The P II

---

[1] Oritani and P II are collectively referred to as P II.

4

Development Mortgage was recorded in the Bergen County Clerk's Office on November 14, 2006, in Mortgage Book 16381, Page 346.

11. To further secure payment of the P II Note and P II Mortgage, the Debtors executed an Absolute Assignment of Leases and Rents dated November 1, 2006 (the "P II Assignment of Rents"). (A true copy of the P II Assignment of Rents is attached as **Exhibit D**.) The P II Assignment of Rents was recorded in the Bergen County Clerk's Office on November 14, 2006, in Mortgage Book 16381, Page 335.

12. Paragraph 1 of the P II Assignment of Rents provides P II with a present, absolute assignment of leases, rents, income and other profits arising from the Golf Course Property. (See P II Assignment of Rents, Exh. D, p. 2.) Specifically, the P II Assignment of Rents provides as follows:

> Assignor does hereby bargain, transfer, assign, convey, set over and deliver unto Assignee, all rights of the lessor under the above-described lease(s) and all other leases affecting the Premises, or any part thereof, now existing or which may be executed at any time in the future during the life of this Absolute Assignment…It is intended hereby to establish a present and complete transfer of all Leases and all rights of the lessor thereunder and all the rents, and other payments arising thereunder on account of the use of the Premises unto Assignee, with the right, but without the obligation, to collect all of said rents, income and other payments which may become due during the life of this Absolute Assignment.

(See id.)

13. On May 31, 2007, Oritani provided another loan to the Debtors in the sum of $1,400,000 pursuant to the terms of a Mortgage Note (the "P II Construction Note"). (A true copy of the PII Construction Note is attached hereto as **Exhibit E**.) To secure payment of the PII Construction Note, the Debtors executed a Mortgage and Security Agreement in favor of Oritani on the Golf Course Property (the "PII Construction Mortgage"). (A true copy of the PII Construction Mortgage is attached hereto as **Exhibit F**.) The P II Construction Mortgage was

5

recorded in the Office of the Clerk of Bergen County on June 5, 2007 in Mortgage Book 16783, Page 467.

14. To further secure payment of the PII Construction Note, the Debtors executed an Absolute Assignment of Rents dated May 31, 2007, which granted Oritani a present, absolute assignment of leases, rents, income and other profits arising from the Golf Course Property (the "PII Construction Assignment of Rents," which together with the P II Note, P II Mortgage, P II Construction Note, P II Construction Mortgage are collectively referred to as the "P II Loan Documents"). (A true copy of the P II Construction Assignment of Rents is attached as **Exhibit G**.)

15. On or about September 16, 2009, P II purchased all of Oritani's right, title and interest in the P II Note, PII Construction Note and related P II Loan Documents pursuant to the terms of a Loan Sale Agreement.

## 2. The Debtors' Default On The P II Loan.

16. The P II Loan Documents provide that if any monthly installment is not paid when due and remains unpaid, an event of default exists whereby the entire principal amount outstanding would become due and payable.

17. The Debtors defaulted under the P II Loan Documents as a result of, among other things, a receiver being appointed in the PRIF Foreclosure Action (described and defined herein) and the Debtors' failure to pay outstanding real estate taxes. By letter dated August 26, 2008, Oritani notified the Debtors of their default under the P II Loan Documents. As a result of the Debtors' default, Oritani declared the entire principal sum due on the P II Note and P II Construction Note, together with all unpaid interest and advances, immediately due and payable.

6

18. Notwithstanding Oritani's repeated demands, the Debtors failed and refused to pay any portion of the indebtedness owed to Oritani. Accordingly, on December 11, 2008, Oritani commenced a foreclosure proceeding against the Debtors in the Superior Court of New Jersey, Bergen County, Chancery Division, Docket No. F-4391-08.

19. In May 2009, P II filed a motion to strike the Debtors' contesting answer and to enter final judgment of foreclosure against the Debtors. P II's motion is currently pending with the Superior Court of New Jersey, Chancery Division, Bergen County.

B. **The Debtors' Pre-Petition Indebtedness To PRIF And Default Under The PRIF Loan Documents**

1. **The PRIF Loan Documents.**

20. On November 1, 2006, PRIF provided a loan to the Debtors in the original principal amount of $6,000,000.00 as evidenced by a Promissory Note (the "PRIF Note"). (A true copy of the PRIF Note is attached as **Exhibit H**.) Pursuant to the PRIF Note, the Debtors bound themselves and promised to pay PRIF all sums due and owing together with accrued interest by October 31, 2007 (the "Initial PRIF Loan Maturity Date"). The PRIF Note obligates the Debtors to pay monthly interest payments to PRIF at a rate equal to prime plus four and three quarters (4.75%) percent. (See PRIF Note, Exhibit H, p. 2). The PRIF Note provides, however, that interest rate shall never be lower than thirteen percent. (See id.).

21. To secure their obligations under the PRIF Note, the Debtors executed a Mortgage, Assignment of Leases and Rents and Security Agreement dated November 1, 2006 (the "PRIF Development Mortgage"), granting PRIF a first mortgage lien on the Development Property. (A true copy of the PRIF Development Mortgage is attached as **Exhibit I**.) The PRIF Development Mortgage was recorded in the Bergen County Clerk's Office on November 14, 2006, in Mortgage Book 16381, Page 379.

7

22. To further secure their obligations under the PRIF Note, the Debtors executed a Fee and Leasehold Mortgage, Assignment of Leases and Rents and Security Agreement dated November 1, 2006 (the "PRIF Golf Club Mortgage," which, together with the PRIF Development Mortgage are collectively referred to as the "PRIF Mortgages"), granting PRIF a mortgage lien on the Golf Course Property. (A true copy of the PRIF Golf Club Mortgage is attached as **Exhibit J**.) The Golf Club Mortgage was recorded in the Bergen County Clerk's Office on November 14, 2006, in Mortgage Book 16381, Page 445.

23. Section 2.13 of the Golf Club Mortgage, titled "Assignment of Leases and Rents," unequivocally provides PRIF with a present absolute assignment of all rents, profits, issues and revenues arising from the Golf Course Property. (See Golf Club Mortgage, Exhibit J, p. 15). Section 2.13 of the Golf Club Mortgage provides, in pertinent part, as follows:

> Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in and to each Lease whether now existing or hereafter entered into, together with all rents, royalties, bonuses, issues, profits, revenues, occupancy charges, issues, profits and other benefits of Mortgagor under the Leases (collectively, the "Rents") of each such Lease as further security for the payment and performance of the Obligations, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for security.

(See id.)

**2.    The Debtors' Default on the PRIF Loan.**

24. On October 29, 2007, the Debtors and PRIF entered into an Extension Agreement pursuant to which the Initial PRIF Loan Maturity Date was extended from October 31, 2007, to April 30, 2008. The extension of the Initial PRIF Loan Maturity Date was conditioned on there being no event of default by the Debtors pursuant to the terms of the PRIF Note, PRIF Mortgages and related loan documents (collectively, the "PRIF Loan Documents").

8

25. The Debtors, however, failed to pay the indebtedness owed to PRIF in accordance with the express terms of the PRIF and related PRIF Loan Documents. Specifically, the Debtors failed to pay the interest payment due for the month of December 2007, unpaid late fees related to the November 2007 payment, and certain legal fees owed to PRIF in accordance with the PRIF Loan Documents.

26. On January 9, 2008, PRIF entered into a Forbearance Agreement with the Debtors pursuant to which the Debtors agreed to make certain payments to PRIF (the "PRIF Forbearance Agreement"). (A true copy of the PRIF Forbearance Agreement is attached as **Exhibit K**.) The Debtors defaulted on their obligations pursuant to the terms of the PRIF Forbearance Agreement and PRIF Loan Documents. Shortly after executing the PRIF Forbearance Agreement, the Debtors failed to pay the interest payment due for the month of January 2008. Additionally, the Debtors failed to obtain the necessary approvals for the Development Property, in accordance with the terms of the PRIF Loan Documents.

27. Pursuant to the express terms of the PRIF Forbearance Agreement, the Debtors agreed that in the event they defaulted on any of their obligations under the PRIF Forbearance Agreement and/or PRIF Loan Documents, the terms of the Extension Agreement would be null and void and the entire outstanding indebtedness owed by the Debtors would be immediately due and payable to PRIF.

28. As a result of the Debtors' defaults on their payment obligations, PRIF was entitled to accelerate and collect the entire indebtedness owed pursuant to the PRIF Loan Documents, as well as all legal fees and litigation expenses incurred by PRIF in connection with the collection of the indebtedness. Notwithstanding PRIF's repeated demands, the Debtors failed

9

and refused to pay any portion of the indebtedness owed to PRIF pursuant to the PRIF Loan Documents.

29. By reason of the Debtors' refusal to cure their monetary defaults, on February 28, 2008, PRIF commenced a foreclosure proceeding in the Superior Court of New Jersey, Bergen County, Chancery Division, Docket No. F-8236-08.  In connection with the foreclosure proceeding, on August 22, 2008, Stephen Sinisi, Esq. was appointed by the Superior Court as Receiver (the "Receiver") for the Mortgaged Premises.  (A true copy of the Order Appointing Receiver is attached as **Exhibit L**.)  The Receiver has been responsible for all aspects of the day-to-day management and operation of the Mortgaged Premises, including the collection of all receipts and income from the operation of the Golf Course Property.

30. On June 23, 2009, the Superior Court entered a Final Judgment of Foreclosure against the Debtors and in favor of PRIF in the amount of $6,633,906.09, together with interest to be computed from March 20, 2009.

31. On October 20, 2009, the Court entered an Amended Writ of Execution.  (A true copy of the Writ of Execution is attached as **Exhibit M**.)  The foreclosure sale was originally scheduled for October 23, 2009, and was subsequently adjourned to February 5, 2010.

32. PRIF provided the Debtors with sufficient time and opportunity to acquire financing to satisfy the indebtedness owed to PRIF and P II.  In July 2008, the Debtors represented that they had received a proposal from a group known as FIMAX to potentially refinance the existing mortgages.  In addition, in the beginning of 2009, the Debtors advised that they were in discussions with Fundex Capital Corp. regarding a potential refinance of PRIF's mortgage.  PRIF did not expedite the prosecution of its foreclosure proceeding so that it could provide the Debtors with an opportunity to refinance its mortgage.  Moreover, on February 13,

2009, PRIF made a protective advance of $92,000 to the Debtors to fund critical expenses in connection with the operation of the golf course for the upcoming 2009 season.

33. In Spring 2009, the Debtors represented to PRIF and P II that a Korean investment group known as NextValue from Seoul, Korea, was potentially interested in providing financing to the Debtors to satisfy PRIF and P II's mortgages and had submitted a proposal to the Debtors in March 2009. The Mortgagees learned that NextValue's March 2009 proposal was revised in September 2009. Notwithstanding PRIF and P II's good faith in affording the Debtors' the opportunity to refinance the mortgage debt before proceeding to a foreclosure sale, the Debtors have been unable to acquire the financing and/or capital to satisfy the substantial indebtedness owed to the Mortgagees.

**MORTGAGEES' SECURITY INTEREST IN THE MORTGAGED PREMISES IS CONTINUING TO ERODE**

34. The Mortgagees are concerned that absent dismissal of the Debtors' petitions or immediate stay relief, their security interest in the Mortgaged Premises will be substantially diminished by virtue of declining market values, leaving the Mortgagees without any adequate protection.

35. Pursuant to an appraisal report dated September 4, 2006, the Golf Course Property was valued at $14,500,000. (A true copy of the Appraisal Summary Report issued by Swift Road Estate Solutions is attached as **Exhibit N**.) Pursuant to an appraisal report dated September 4, 2006, the Development Property (as is, and without municipal approvals for development) was valued at $3,300,000. (A true copy of the Appraisal Summary Report issued by Swift Real Estate Solutions is attached as **Exhibit O**.)

36. I have worked in the commercial real estate industry for over 25 years. During the past seven (7) years, I have been a principal of Palisades Financial, LLC, a leading real estate

11

investment banking firm specializing in New Jersey and New York commercial loans and financing. During the past two and one half (2 ½) years, I closed over 130 commercial real estate transactions totaling over $1 billion. As a commercial real estate professional with over 25 years of experience, I have gained the knowledge and expertise to analyze the value of commercial properties in connection with my analysis of real estate investment transactions.

37. Based on my analysis of current real estate market conditions in the New Jersey/New York region, I believe that the fair market value of the Mortgage Premises have declined by approximately 20% from their September 2006 valuations. Even if the Court were to apply the valuations of the Golf Course Property and Development Property as of September 2006 (when the real estate market and credit markets were strong), the outstanding mortgage indebtedness against each property well exceeds the value of each property. A schedule of the September 2006 valuations and secured mortgage liens of the Golf Course Property and Development Property is set forth below:

| **Mortgaged Premises** | **Sept. 2006 Valuation** | **Secured Debt Amount (As of Feb. 1, 2010)** |
|---|---|---|
| Golf Course Property | $15 Million | P II First Mortgage - $12,325,872.31<br>P II Second Mortgage - $1,861,652.10<br>P II Mortgages Total = $14,187,524.41<br><br>PRIF Third Mortgage - $7,000,761.10<br><br>**Secured Debt Total = $21,188,285.51** |
| Development Property | $3.3 Million | PRIF First Mortgage - $7,000,761.10<br><br>P II Second Mortgage - $12,341,000.52<br><br>**Secured Debt Total = $19,341,761.62** |
|  | **Valuation Total = $18.3 Million** | **Total Secured Debt = $21,188,285.51** |

38. As set forth above, as of February 1, 2010, P II was owed **$14,202,652.62** pursuant to the P II Loan Documents, and PRIF was owed **$7,000,761.10** pursuant to the PRIF

12

Loan Documents. (A schedule of the amounts due to P II and PRIF is attached as **Exhibit P**.) The mortgage debt owed to P II and PRIF total **$21,132,339.27**, which well exceeds the value of the Mortgaged Premises **($18.3 million)**. In addition, the debt owed to PRIF alone (**$7,000,761.10**) well exceeds the value of the Development Property **($3.3 million)**.

39. No equity exists in the Mortgaged Premises above the Mortgagees' security interest. To the contrary, the Debtors' total mortgage debt exceeds the value of the Mortgaged Premises by approximately $2 million. As real estate values continue to decline in this difficult and uncertain real estate market, this deficiency will only escalate, further jeopardizing the Mortgagees' security interest.P II and PRIF, therefore, request that the Court dismiss the Debtors' Chapter 11 petition or, alternatively, grant relief from the automatic stay so that PRIF and P II can proceed with their foreclosure proceedings.

40. In the event the Court is not inclined to dismiss the Debtors' Chapter 11 petitions, P II and PRIF request the Court to permit the Receiver and his management group to continue with the day-to-day operation and management of the golf club. During the 14 months since his appointment, the Receiver and his management group have acquired considerable knowledge regarding the operations of the golf club, and have successfully restored credibility to the critical vendors that has allowed the club to maintain its operations. Unlike commercial real estate with more predictable operations, this golf club is faced with critical decisions on a daily basis. A change in the court-appointed manager of the golf club, and the resulting time required for a new manager to become familiar with the club and its vendors, could result in both a delay in opening the club for the 2010 golf season and impair the viability and operations for the 2010 season.

**WHEREFORE**, it is respectfully requested that the Court enter an Order: (a) dismissing the Debtors' Chapter 11 proceedings as bad faith filings pursuant to 11 U.S.C. § 1112 of the

13

Bankruptcy Code, or, alternatively, (b) granting relief from the automatic stay provisions of Section 362(d) of the Bankruptcy Code; (c) excusing the Receiver from compliance under 11 U.S.C. § 543(d); and (d) prohibiting the Debtors from the use of cash collateral pursuant to 11 U.S.C. §§ 363(c)(2) and (e).

Case 10-13393-DHS    Doc 5-1    Filed 02/05/10    Entered 02/05/10 15:34:26    Desc
Affidavit of David McLain in Support of Motion    Page 14 of 15

14

42952/0017-6223267v1

                                                */s/David McLain*
                                                DAVID MCLAIN

Sworn and subscribed to
before me this 5th day
of February, 2010

/s/Mary Manetas
Notary Public of the State of NJ
My Commission Expires 04/18/2010

15

42952/0017-6223267v1