**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Leo V. Leyva, Esq.
James T. Kim, Esq.
Attorneys for PRIF II Chemtek, LLC and P II River Vale GC Funding, LLC

|  |  |  |
|---|---|---|
|  |  | UNITED STATES BANKRUPTCY COURT |
|  |  | FOR THE DISTRICT OF NEW JERSEY |
|  |  | CASE NO. 10-13393 (DHS) |

|  |  |
|---|---|
| _____ : | Chapter 11 |
| In re: : |  |
| : |  |
| CHEMITEK 2006, LLC, : | **HEARING DATE AND TIME:** |
| : | February ___, 2010 at ___:___ __.m. |
| Debtor-in-Possession. : |  |
| : | **ORAL ARGUMENT REQUESTED** |
| : |  |
| _____ : |  |

---

**PRIF II CHEMTEK, LLC AND P II RIVER VALE GC FUNDING, LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER**
**(A) DISMISSING THE DEBTOR'S CHAPTER 11 PETITION PURSUANT TO 11 U.S.C.**
**§ 1112(b) OR ALTERNATIVELY, (B) GRANTING RELIEF FROM THE AUTOMATIC**
**STAY PURSUANT TO 11 U.S.C. § 362(d); (C) EXCUSING RECEIVER FROM**
**COMPLIANCE UNDER 11 U.S.C. § 543(d); AND (D) PROHIBITING, TO THE EXTENT**
**APPLICABLE, THE DEBTOR FROM USE OF CASH COLLATERAL PURSUANT TO**
**11 U.S.C. § 363(c)(2) AND (e)**

---

Of Counsel and On the Brief:
   Leo V. Leyva
On the Brief:
   James T. Kim
   Felice Yudkin

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ......................................................................................5

LEGAL ARGUMENT............................................................................................6

I.   THE DEBTORS' CHAPTER 11 PETITIONS WERE FILED IN BAD
     FAITH AND IN AN EFFORT TO FURTHER DELAY THE
     FORECLOSURE SALE. ..................................................................... 6

II.  IN THE EVENT THIS COURT IS DISINCLINED TO DISMISS
     DEBTORS' PETITIONS, THE AUTOMATIC STAY SHOULD BE
     LIFTED PURSUANT TO 11 U.S.C. § 362(D)(1). ............................. 10

     A.   STAY RELIEF IS APPROPRIATE BASED ON THE DEBTORS'
          BAD FAITH FILINGS. ........................................................... 10

     B.   STAY RELIEF IS NECESSARY TO PRESERVE THE
          MORTGAGEES' SECURITY INTEREST. ............................. 11

III. THE AUTOMATIC STAY SHOULD BE VACATED PURSUANT TO
     11 U.S.C. § 362(D)(2) BECAUSE NO EQUITY EXISTS IN THE
     PROPERTY AND THE PROPERTY IS NOT NECESSARY TO AN
     EFFECTIVE REORGANIZATION. .................................................... 13

     A.   THE DEBTORS LACK EQUITY IN THE PROPERTY. ...................... 14

     B.   THE DEBTORS CANNOT REORGANIZE. ......................... 15

          1.   THE DEBTORS ALSO CANNOT REORGANIZE
               BECAUSE THEY HAVE NO SOURCE OF INCOME TO
               OPERATE THEIR BUSINESS................................... 16

IV.  THE RECEIVER SHOULD REMAIN IN POSSESSION OF INCOME
     DERIVED FROM THE PROPERTY AND BE EXCUSED FROM
     COMPLIANCE UNDER SECTION 543(D)(1) OF THE BANKRUPTCY
     CODE.................................................................................. 19

V.   ASSUMING THE INCOME IS PROPERTY OF THE DEBTORS'
     ESTATES, THOSE FUNDS CONSTITUTE MORTGAGEES' CASH
     COLLATERAL AND MUST BE DEPOSITED INTO A SEGREGATED
     ACCOUNT. ........................................................................ 23

CONCLUSION.....................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

In re 234-6 West 22 Street Corp., 214 B.R. 751 (Bankr. S.D.N.Y. 1997)......................................10

ABN AMRO Bank N.V. v. Carmania Corp. N.V. (In re Carmania Corp., N.V.), 154 B.R.
        160 (Bankr. S.D.N.Y. 1993) ...........................................................................................24

In re Boca Dev. Assoc., 21 B.R. 624 (Bankr. S.D.N.Y. 1982).....................................................16

Butner v. United States, 440 U.S. 48 (1979) ...............................................................................17

In re C-TC 9th Avenue Partnership, 113 F.3d 1304 (2d Cir. 1997) ...........................................6, 8

In re Cadwell's Corners Partnership, 174 B.R. 744 (Bankr. N.D. Ill. 1994).................................15

In re Campbell, 124 B.R. 462 (Bankr. W.D. Pa. 1991) ...................................................................6

Carolin Corp. v. Miller, 886 F.2d 693 (4th Cir. 1989) ....................................................................6

In re Carretta, 220 B.R. 203 (D.N.J. 1998).............................................................................17, 18

In re Century/ML Cable Venture, 294 B.R. 9 (Bankr. S.D.N.Y. 2003) ...........................................6

In re Constable Plaza Assocs., L.P., 125 B.R. 98 (Bankr. S.D.N.Y. 1991)...................................21

Dallas-Fort Worth Regional Airport Board v. Braniff Airways, Inc., 26 B.R. 628 (N.D.
        Tex. 1982) .......................................................................................................................14

In re DiDario, 232 B.R. 311 (Bankr. D. N.J. 1999) ......................................................................14

Dill v. Dime Sav. Bank, FSB (In re Dill), 163 B.R. 221 (E.D.N.Y. 1994) ............................20, 21

In re Diplomat Electronics Corp., 82 B.R. 668 (Bankr. S.D.N.Y. 1988) ......................................14

In re Dunes Casino Hotel, 69 B.R. 783 (Bankr. D.N.J. 1986)........................................................14

In re Dunes Casino Hotel, 69 B.R. 784 (Bankr. D. N.J. 1986)......................................................11

In re Elmira Litho, Inc., 174 B.R. 892 (Bankr. S.D.N.Y. 1994)....................................................11

In re Faires, 34 B.R. 549 (Bankr. W.D. Wash. 1983)...................................................................14

In re Flower City Nursing Home, Inc., 38 B.R. 642 (Bankr. W.D.N.Y. 1984).............................24

In re Foundry of Barrington Partnership, 129 B.R. 550 (Bankr. N.D. Ill. 1991)..........................20

French Bourekas, Inc. v. Turner, 199 B.R. 807 (E.D.N.Y. 1996) ..................................................20

In re Gilbert Broadcasting Corp., 54 B.R. 2 (Bankr. D.N.J. 1984)...................................................6

In re Glen Props., 168 B.R. 537 (D.N.J. 1993) .............................................................................17

In re HBA East, Inc, 87 B.R. 248 (Bankr. E.D.N.Y. 1988)..........................................................6, 7

In the Matter of Sundale Assocs., Ltd., 48 B.R. 288 (S.D. Fla. 1984) ...........................................7

In re Island Helicopter Corp., 63 B.R. 809 (Bankr. E.D.N.Y. 1986)............................................15

Jason Realty, L.P. v. First Fidelity Bank, N.A. (In re Jason Realty, L.P.), 59 F.3d 423
    (1995) .............................................................................................................................9, 17, 18

In re Jug End in Berkshires, Inc., 46 B.R. 892 (Bankr. D. Mass. 1985).......................................14

In re KCC-Fund v. Ltd., 96 B.R. 237 (Bankr. W.D. Mo. 1980)....................................................21

In re Kessler, 76 B.R. 434 (Bankr. E.D. Pa. 1987) .......................................................................13

In re Kingston Square Assocs., et al., 214 B.R. 713 (Bankr. S.D.N.Y. 1997)................................6

In re Laguna Assocs., L.P., 30 F.3d 734 (6th Cir. 1994) ..............................................................10

In re Little Creek Dev. Co., 779 F.2d 1068 (5th Cir. 1986) ...........................................................8

In re Lizeric Realty, 188 B.R. 499 (Bankr. S.D.N.Y. 1995)........................................................21

MacArthur Executive Assocs. v. State Farm Life Ins. Co., 190 B.R. 189 (D.N.J. 1995) .............17

Matter of Cardell, 88 B.R. 627 (Bankr. D.N.J. 1988)..................................................................14

Matter of Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444 (Bankr. D.N.J. 1993) .............6, 8

New Jersey Nat'l Bank and Trust Co. of Newark v. Wolf, 108 N.J. Eq. 412 (1931)....................17

In re Northport Marina Assoc., 136 B.R. 903 (Bankr. E.D.N.Y. 1992) ........................................24

In re Pegasus Agency, Inc., 101 F.3d 882 ................................................................................13, 15

In re Phoenix Piccadilly, Ltd., 849 F.2d 1393 (11th Cir. 1988) ..................................................7, 8

In re Playa Dev. Corp., 68 B.R. 549 (Bankr. W.D. Tex. 1986)....................................................15

In re Ravick Corp., 106 B.R. 834 ....................................................................................................7

In re Robbins, 964 F.2d 342 (4th Cir. 1992)................................................................................10

42952/0017-6010043v1

In re Saypol, 31 B.R. 796 (Bankr. S.D.N.Y. 1983) .......................................................15

In re SB Properties, Inc., 185 B.R. 198 (Bankr. E.D. Pa. 1995)........................................8

In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999).............................................6, 7

In re Sharon Steel Corp., 159 B.R. 730 (Bankr. W.D. Pa. 1993) ...................................11

In re Sundance Corp., 83 B.R. 746 (Bankr. Mont. 1988) ...........................................21

Terra Mar Dev. Corp. v. Terra Mar Assoc. (In re Terra Mar Assoc.), 3 B.R. 462 (Bankr. D. Conn. 1980)........................................................................................15, 16

In re The Ad Brite Corp., 290 B.R. 209 (Bankr. S.D.N.Y. 2003) ...................................6

In re The Score Board, Inc., 258 B.R. 585 (D.N.J. 1999)............................................10

In re Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365 (1988) ........................11, 15

Trident Assocs. v. Metro Life Ins. Co., 52 F.3d 127 (6th Cir. 1995) ...........................10

In re Wilson, 116 F.3d 87 (3d Cir. 1997)..................................................................10

In re Woodbranch Energy Plaza One, Ltd., 44 B.R. 733 (Bankr. S.D. Tex. 1984)......................13

Woods Corp. Assocs. v. Signet Star Holdings, Inc., 910 F.Supp. 1019 (D.N.J. 1995)................17

42952/0017-6010043v1

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of the motion of PRIF II Chemtek, LLC ("PRIF") and P II River Vale GC Funding, LLC ("P II" which, together with PRIF are collectively referred to as the "Mortgagees") seeking, among other relief, an Order: (a) dismissing Chemitek 2006 LLC ("Chemitek") and Palisades Park Plaza North, Inc. ("Palisades" which, together with Chemitek are collectively referred to as the "Debtors") Chapter 11 petitions pursuant to 11 U.S.C. § 1112(b) or, alternatively, (b) granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d).  In addition, the Mortgagees seeks an Order excusing Stephen Sinisi, Esq. (the "Receiver"), a state court-appointed receiver, from the mandate of the automatic stay pursuant to 11 U.S.C. § 543(d) and prohibiting, to the extent applicable, the Debtors from use of cash collateral pursuant to 11 U.S.C. § 363(c)(2) and (e).

These bankruptcy proceedings represent the Debtors' most recent attempt to derail the Mortgagees' state court foreclosure proceedings and enforcement of a final judgment of foreclosure by PRIF.  The real property that is the subject of this dispute (and the Debtors' primary asset) consists of a golf course in River Vale, New Jersey known as the River Vale Country Club (the "Golf Course Property") and an adjacent development parcel (the "Development Property") (collectively, the "Mortgaged Property").  The Mortgagees each possesses a valid mortgage lien on the Mortgaged Property which have been in default for a over two (2) years.  With no strategy in place to satisfy their mortgage indebtedness - - presently in excess of **$21 million** - - the Debtors now seek this Court's countenance in further delaying the Mortgagees' recovery under the guise of a purported reorganization effort.

On November 1, 2006, P II's predecessor-in-interest, Oritani Bank ("Oritani'), provided a loan to the Debtors in the original principal amount of $9 million (the "P II Loan").  The P II Loan was secured by a first mortgage against the Golf Course Property in the original principal

amount of $9 million, and further secured by second mortgage against the Development Property

in the original principal mount of $9 million.  On November 1, 2006, PRIF provided a loan to the

Debtors in the original principal amount of $6 million (the "PRIF Loan").  The PRIF loan was

secured by a first mortgage against the Development Property in the original principal amount of

$6 million, and further secured by subordinate mortgage against the Golf Course Property in the

original principal amount of $6 million.  On May 31, 2007, Oritani provided an additional loan

to the Debtors in the original principal amount of $1.4 million (the "P II Construction Loan"),

which was secured by a second mortgage against the Golf Course Property in the original

principal amount of $1.4 million.[1]  As of February 1, 2010, P II is owed the sum of

**$14,187,524.41** pursuant to the P II Loan and P II Construction Loan.  As of January 31, 2010,

PRIF is owed the sum of **$7,000,761.10** pursuant to the PRIF Loan.[2]

The Debtors have engaged in numerous unsuccessful litigation tactics, all aimed at

delaying the inevitable liquidation and sale of the Debtors' assets to satisfy the outstanding

obligations owed to the Mortgagees.  The Debtors now seek the protection of the Bankruptcy

Code to further prolong the inevitable sale of the Mortgaged Property.  Although it has been over

two (2) years since the Debtors first defaulted on their financial obligations, the Debtors have

made no attempt to refinance or otherwise secure the necessary capital to satisfy their substantial

debts.  It is clear the Debtors are in no position to address their escalating indebtedness –

---

[1] PRIF agreed to subordinate its $6 million mortgage against the Golf Course Property to Oritani's $1.4 million second mortgage.  As a result, PRIF currently holds a third mortgage against the Golf Course Property.

[2] On June 23, 2009, the Superior Court of New Jersey, Chancery Division, Bergen County entered Final Judgment of Foreclosure against the Debtors and in favor of PRIF in the amount of $6,633,906.09, together with interest to be computed from March 20, 2009, through the present.

2

especially considering the recent collapse of the financial and real estate markets and deepening credit crisis.

The impropriety of the Debtors' Chapter 11 petitions is most evident, however, from the timing of these proceedings. The Debtors filed their Chapter 11 petitions a few hours before the Mortgaged Property was scheduled for sale by public auction. Against this background of untoward conduct and considering these filings were precipitated by what is essentially a two-party dispute, the Mortgagees respectfully request that this Court exercise its discretion and dismiss the Debtors' Chapter 11 petitions as bad faith filings pursuant to 11 U.S.C. § 1112(b).

In the event this Court is not inclined to dismiss the Debtors' petitions at this time, at a minimum, cause exists to lift the automatic stay pursuant to 11 U.S.C. § 362(d) to permit the Mortgagees to proceed with the foreclosure sale. Absent this relief, the Mortgagees' security interest in the Mortgaged Property, which has already been diminished by the depressed real estate markets, will be placed in further jeopardy. The appraisals obtained by the Mortgagees confirm that the fair market value of the Golf Course Property was $15 million and the fair market value of the Development Property was $3.3 million as of September 2006. As demonstrated in the supporting Affidavit of David McLain ("McLain Aff."), the fair market value of the Mortgage Property has declined by approximately 20% from their September 2006 valuations. (See McLain Aff., ¶ 37.)

Even if the Court applied the September 2006 valuations of the Golf Course Property and Development Property (when the real estate market and credit markets were strong), the outstanding mortgage indebtedness against each property well exceeds the value of each property. Because the total mortgage debt against the Golf Course Property is **$21,188,285.51** (as of February 1, 2010), the Mortgagees are undersecured by approximately $6 million as to the

3

Golf Course Property, even utilizing the 2006 valuations.  In addition, the value of PRIF's first mortgage against the Development Property (**$7,000,761.10**) well exceeds the value of the Development Property by approximately $3.7 million.  The Mortgagees are concerned that as real estate values continue to decline, this deficiency will only increase, leaving the Mortgagees without any protection whatsoever.

In accordance with the rights conferred upon the Mortgagees pursuant to the loan documents, which confers upon the Mortgagees a present and absolute assignment of all rent and income issuing from the property, it is also requested that the Court excuse the Receiver's compliance with the automatic stay provisions of the Bankruptcy Code.  By virtue of the absolute assignments of rents, the Debtors possess no interest in the Mortgaged Property's receipts and income, all of which belong to the Mortgagees.  Furthermore, the release of the receipts and income to the Debtors' estates would not contribute in any meaningful fashion to a successful reorganization and would only serve to further jeopardize the Mortgagees' secured claims.

For these reasons, and those set forth below, it is respectfully requested that the Court grant the Mortgagees' motion to dismiss the Debtors' Chapter 11 petitions or, alternatively, afford the Mortgagees relief from the automatic stay and excuse the Receiver from compliance under the turnover provisions of the Bankruptcy Code under 11 U.S.C. § 543(d).

4

## __STATEMENT OF FACTS__

The relevant Statement of Facts are set forth in the accompanying Affidavits of David McLain and Stephen P. Sinisi and Affirmation of Leo V. Leyva, together with exhibits annexed thereto.[3]  For the sake of brevity, those facts will not be repeated below, but are incorporated by reference.

---

[3] Capitalized terms used herein have the same meaning ascribed to said terms in the accompanying Affidavits of David McLain and Stephen P. Sinisi and Affirmation of Leo V. Leyva.

## <u>LEGAL ARGUMENT</u>

I.    **THE DEBTORS' CHAPTER 11 PETITIONS WERE FILED
IN BAD FAITH AND IN AN EFFORT TO FURTHER
<u>DELAY THE FORECLOSURE SALE.</u>**

The Debtors' Chapter 11 petitions were filed in bad faith and designed solely to derail the

February 5, 2010, foreclosure sale of the Mortgaged Property.  Because the Debtors have failed

to properly invoke the protections of the Bankruptcy Code, the Debtors' Chapter 11 petitions

should be dismissed.

The Bankruptcy Code does <u>not</u> expressly condition the right to file a Chapter 11 petition

on the debtor's "good faith."[4]  Section 1112(b), however, authorizes the Bankruptcy Court to

dismiss a proceeding "for cause" and sets forth a non-exclusive list of factors constituting such

"cause."  11 U.S.C. § 1112(b); <u>see also</u> <u>In re HBA East, Inc</u>, 87 B.R. 248, 258 (Bankr. E.D.N.Y.

1988); <u>In re C-TC 9th Avenue Partnership</u>, 113 F.3d at 1311 (list of factors constituting cause for

dismissal under Section 1112(b) is "illustrative, not exhaustive").

The bankruptcy court has wide discretion to dismiss a Chapter 11 case under any of the

grounds enumerated in 11 U.S.C. § 1112(b).  <u>See</u> <u>In re Century/ML Cable Venture</u>, 294 B.R. 9,

34 (Bankr. S.D.N.Y. 2003); <u>In re The Ad Brite Corp.</u>, 290 B.R. 209, 215 (Bankr. S.D.N.Y.

2003); <u>In re Kingston Square Assocs., et al.</u>, 214 B.R. 713, 724 (Bankr. S.D.N.Y. 1997); <u>Matter

of Newark Airport/Hotel Ltd. Partnership</u>, 156 B.R. 444, 448 (Bankr. D.N.J. 1993), <u>aff'd</u>, 155

B.R. 93 (D.N.J. 1993) (citing <u>In re Gilbert Broadcasting Corp.</u>, 54 B.R. 2, 4 (Bankr. D.N.J.

---

[4]  It is well established, however, that good faith is an implied jurisdictional requirement
for filing of a bankruptcy petition.  <u>In re C-TC 9th Avenue Partnership</u>, 113 F.3d 1304, 1310 (2d
Cir. 1997) (noting that bankruptcy reorganization provisions since 1898 have incorporated
expressly, or by judicial interpretation, a good faith standard for the commencement of
bankruptcy cases); <u>see also</u> <u>In re SGL Carbon Corp.</u>, 200 F.3d 154, 160-61 (3d Cir. 1999);
<u>Carolin Corp. v. Miller</u>, 886 F.2d 693, 699 (4th Cir. 1989); <u>In re Campbell</u>, 124 B.R. 462 (Bankr.
W.D. Pa. 1991).

42952/0017-6010043v1

1984)); <u>In the Matter of Sundale Assocs., Ltd.</u>, 48 B.R. 288, 290 (S.D. Fla. 1984).  The term

"cause" is intentionally not defined with particularity in the Bankruptcy Code "to afford

maximum flexibility and, among other things, to enable a bankruptcy court to dismiss a Chapter

11 case for any reason cognizable to the equity power and conscience of the court as constituting

an abuse of the bankruptcy process."   <u>HBA East</u>, 87 B.R. at 258.  "Cause" may be established

by a showing that a debtor lacked good faith in commencing its Chapter 11 case.  <u>SGL Carbon</u>,

200 F.3d at 162 ("a Chapter 11 petition is subject to dismiss for 'cause' under 11 U.S.C. §

1112(b) unless it is filed in good faith."); <u>In re Phoenix Piccadilly, Ltd.</u>, 849 F.2d 1393 (11th Cir.

1988) (Chapter 11 petition may be dismissed for "cause" under § 1112(b) if not filed in good

faith); <u>In re Ravick Corp.</u>, 106 B.R. 834, 842 (Bankr. D.N.J. 1989 (dismissal appropriate where

case not filed to achieve valid purpose of Chapter 11).

     In determining whether a debtor has instituted a bad faith filing, courts consider the

following non-exclusive factors including, without limitation:

     (1)     Whether the debtor has only one asset;

     (2)     Whether the debtor has few unsecured creditors whose
claims are small in relation to the secured creditors;

     (3)     Whether the debtor's one asset is the subject of a
foreclosure action as a result of arrearages or default;

     (4)     Whether the debtor's financial condition reflects in essence,
a two party dispute between the debtor and the secured creditor
which can be resolved in the pending foreclosure action;

     (5)     Whether the timing of the debtor's filing evidences an
intent to delay or frustrate the legitimate efforts of the debtor's
secured creditors to enforce their rights;

     (6)     Whether the debtor has little or no cash flow;

     (7)     Whether the debtor lacks the possibility of reorganization;
and

(8)    Whether the debtor has any employees.

See Y.J. Sons & Co., Inc., 212 B.R. 793, 802 (Bankr. D.N.J. 1997); In re C-TC 9th Ave.

Partnership, 113 F.3d at 1311; In re Phoenix Piccadilly, Ltd., 849 F.2d at 1394-95; In re SB

Properties, Inc., 185 B.R. 198, 205 (Bankr. E.D. Pa. 1995); In re Little Creek Dev. Co., 779 F.2d

1068, 1072-1073 (5th Cir. 1986).  These factors or indicia of bad faith should not, however, be

rigidly applied, but viewed broadly in the light of the circumstances of a particular case.  See

Newark Airport/Hotel, 156 B.R. at 448; see also Y.J. Sons & Co., 212 B.R. at 802 (quoting In re

Little Creek Dev. Co., 779 F.2d at 1072) ("Findings of lack of good faith…have been predicated

on certain recurring but non-exclusive patters, and they are based on a conglomerate of factors

rather than any single datum.").

Here, the Debtors satisfy most (if not all) of the controlling factors to be considered in

determining whether a bad faith filing has occurred.  The facts set forth in the accompanying

Affidavits of David McLain and Leo V. Leyva confirm the presence of these factors, each of

which are addressed below:

- Factor 1:  *The Debtors have only one asset*.  The Debtors' primary asset is the Mortgaged Property.

- Factor 2:  *The Debtors have few unsecured creditors*.  The Debtors have few unsecured creditors.  A court-appointed receiver has been managing the Mortgaged Property and paying known liabilities as they come due.

- Factor 3: *Debtors' primary asset is the subject of a foreclosure proceeding.*  Based on the Debtors' unequivocal pre-petition defaults, on February 28, 2008, PRIF commenced a foreclosure proceeding against the Debtors.  A final judgment of foreclosure was entered on June 23, 2009, against the Debtors and in favor of PRIF and a foreclosure sale was scheduled for February 5, 2010. On December 11, 2008, Oritani, P II's predecessor, commenced a separate judicial foreclosure proceeding against the Debtors.  It is clear that the Debtors initiated

8

these proceedings in anticipation of and for purposes of stonewalling PRIF's contractual right to foreclose on the Mortgaged Property.

- Factors 4 & 5: *This filing is essentially the product of a two party dispute which has been adjudicated in another forum.* As evidenced by the Foreclosure Judgment entered by the state court on June 23, 2009, the Debtors possess no legal basis to defeat PRIF's foreclosure claim. Having exhausted every conceivable tactic to delay/prevent the foreclosure sale, the Debtors filed these Chapter 11 proceedings in yet another effort to frustrate PRIF's legitimate efforts to enforce its rights under the PRIF Mortgages. In all respects, this dispute constitutes a garden variety commercial foreclosure action, which has already been adjudicated in another forum.

- Factors 6 & 7: *The Debtors have little or no cash flow and lack any ability to successfully reorganize.* As set forth herein, the Debtors' only source of income is the receipts and income derived from the Mortgaged Property. Because the Mortgagees hold a present and absolute assignment of rents and income from the Debtors, the Debtors lacks any ownership interest in those rents and income. See Jason Realty, L.P. v. First Fidelity Bank, N.A. (In re Jason Realty, L.P.), 59 F.3d 423, 425 (1995) (discussed in detail herein). Accordingly, there is no operating income which the Debtors can utilize to operate their business. In the absence of access to any income, the Debtors' Chapter 11 cases are shams for which no reorganization is possible whatsoever.

- Factor 8: *The Debtors have few full time employees.* The Debtors only have few full time-employees reporting to the Receiver's property manager.

Application of these controlling factors overwhelmingly mandates the dismissal of the Debtors' Chapter 11 petitions. The "totality of the circumstances" confirms the Debtors have instituted these Chapter 11 proceedings in bad faith solely to abuse the judicial process and prevent the foreclosure of the Mortgaged Property. For all of the aforementioned reasons, it is respectfully requested that the Court grant the Mortgagees' motion to dismiss the Debtors' Chapter 11 proceedings pursuant to 11 U.S.C. § 1112(b).

## II.    IN THE EVENT THIS COURT IS DISINCLINED TO DISMISS DEBTORS' PETITIONS, THE AUTOMATIC STAY SHOULD BE LIFTED PURSUANT TO 11 U.S.C. § 362(d)(1).

A party in interest is entitled to relief from the automatic stay if it can show "cause," including "the lack of adequate protection of an interest in property of such party". 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define the term "cause," leaving courts to "consider what constitutes cause based on the totality of the circumstances in each particular case." In re Wilson, 116 F.3d 87, 90 (3d Cir. 1997) (citing Trident Assocs. v. Metro Life Ins. Co., 52 F.3d 127 (6th Cir. 1995)). Indeed, "[c]ause is viewed as a broad and flexible concept." In re The Score Board, Inc., 258 B.R. 585, 593 (D.N.J. 1999). Accordingly, the decision to lift the automatic stay under Section 362(d)(1) is within the sound discretion of the court. In re Robbins, 964 F.2d 342, 345 (4th Cir. 1992).

In these cases, cause exists under Section 362(d)(1) of the Bankruptcy Code to vacate the automatic stay because, as established in greater detail above, the Debtors filed their Petitions in bad faith. Further mandating stay relief is the fact the Mortgagees' security interest in the Mortgaged Property is not adequately protected and will only continue to erode by virtue of the hostile and uncertain market conditions.

### A.    Stay Relief is Appropriate Based on the Debtors' Bad Faith Filings.

The same factors which constitute cause to dismiss a case apply equally to a request that the automatic stay be lifted or modified. In In re 234-6 West 22 Street Corp., 214 B.R. 751 (Bankr. S.D.N.Y. 1997), the Court held that "the standards for bad faith as evidence of cause," whether in the context of dismissal or relief from the stay, "are not substantively different from each other." Id. at 757; see also In re Laguna Assocs., L.P., 30 F.3d 734, 737 (6th Cir. 1994). As stated in more detail above, most (if not all) of the factors indicative of a bad faith bankruptcy

filing are present here.  These bad faith filings, alone, constitute sufficient cause to lift the

automatic stay pursuant to Section 362(d) of the Bankruptcy Code.

**B.      Stay Relief is Necessary to Preserve the Mortgagees'
        Security Interest.**

A debtor/trustee bears the burden of proving that the subject property is being adequately

protected.  11 U.S.C. § 362(g)(2).  Although adequate protection is not defined in the Bankruptcy

Code, Section 361 specifies three means of providing adequate protection: (1) periodic cash

payments; (2) providing additional or replacement liens; or (3) other relief that will result in the

"indubitable equivalent." 11 U.S.C. § 361.  The purpose of the adequate protection requirement

is to protect a secured creditor against a decline in value of secured property being used by the

estate.  See In re Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 370 (1988); In re Sharon

Steel Corp., 159 B.R. 730, 734 (Bankr. W.D. Pa. 1993) ("The concept of adequate protection is

based on the requirement that the collateral of a secured creditor be protected from erosion in

value").

Although the existence of an equity cushion is not expressly mentioned in Section 361 of

the Bankruptcy Code, an equity cushion is a recognized form of adequate protection.  See In re

Elmira Litho, Inc., 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) (holding that "an equity cushion

can, in certain circumstances, serve as a form of adequate protection"); In re Dunes Casino

Hotel, 69 B.R. 784, 794 (Bankr. D. N.J. 1986) ("The existence of equity above the secured

party's interest which provides an 'equity cushion' to the secured party may, in a given case,

provide adequate protection").

Absent dismissal of the Debtors' petitions or immediate stay relief, the Mortgagees'

security interest in the Mortgaged Property will be substantially diminished by virtue of

declining market values, leaving the Mortgagees without any adequate protection.  The Appraisal

11

Summary Report confirms that the fair market value of the Golf Course Property (as of September 2006) is $15 million.  (See McLain Aff., ¶ 35.)  The appraisal of the Golf Course Property unequivocally establishes that no equity exists in the Golf Course Property above the Mortgagees' secured debt which total **$21,188,285.51** as of February 1, 2010.  (See McLain Aff., ¶ 37.)  To the contrary, the Debtors' mortgage debt exceeds the value of the Golf Course Property by approximately $6 million, even utilizing the 2006 valuations.

In addition, the Appraisal Summary Report confirms that the fair market value of the Development Property (as of September 2006) is $3.3 million, which is substantially less than the indebtedness owed by the Debtors pursuant to PRIF's first mortgage (**$7,000,761.10**) against the Development Property.  (See McLain Aff., ¶¶ 35, 37.)  There is no question that the total amount of the Mortgagee's secured debt (**$21,188,285.51**) well exceeds the fair market value of the Mortgaged Property (**$18.3 million**).  As real estate values continue to decline, this deficiency will only continue to escalate, further jeopardizing the Mortgagees' security interest.[5]

Although it is anticipated that the Debtors may assert the Mortgagees are adequately protected by virtue of the property's income, that contention is erroneous and intellectually dishonest.  Considering the Mortgagees are undersecured by approximately $6 million as to the Golf Course Property, the approximate $239,254 per month in gross income generated by the Golf Course Property is inadequate to provide any level of protection to the Mortgagees.[6]  Based

---

[5] The monthly debt service pursuant to the terms of the PII Loan Documents was $76,404.12.  The monthly debt service pursuant to the terms of the PRIF Loan Document was $65,207.64.

[6] During the period of January 2009, through December 2009, the golf club collected approximately $2,871,050 in receipts, which equals approximately $239,254 in receipts per month.  (See Sinisi Aff., ¶12). The Development Property is currently vacant land and does not generate any income or receipts to the Debtors.

on the absence of an equity cushion in the Mortgaged Property and the Debtors' inability to

otherwise adequately protect the Mortgagees' security interest, relief from the automatic stay is

appropriate.  See In re Kessler, 76 B.R. 434, 438 (Bankr. E.D. Pa. 1987) (holding that "We

believe that it is a fair statement that, if a debtor has failed to make payments to his mortgagee,

and is unable to articulate any particular circumstances which render the mortgagee adequately

protected in spite of this fact, then relief from the automatic stay should follow").

Considering the glaring lack of equity in the Mortgaged Property and the Debtors'

inability to provide any measure of protection to the Mortgagees, relief from the automatic stay

must be granted. [7]  The Mortgagees should not be exposed to further dissipation of their

collateral while the Debtors seek to further delay the inevitable liquidation of their asset.

### III.    THE AUTOMATIC STAY SHOULD BE VACATED PURSUANT TO 11 U.S.C. § 362(D)(2) BECAUSE NO EQUITY EXISTS IN THE PROPERTY AND THE PROPERTY IS NOT NECESSARY TO AN EFFECTIVE REORGANIZATION.

Section 362(d)(2) of the Bankruptcy Code permits relief from the automatic stay if (i) a

debtor does not have equity in the property, and (ii) such property is not necessary to an effective

reorganization.  11 U.S.C. § 362(d)(2).  For the creditor to obtain relief, both elements of section

362(d)(2) must be satisfied.  See, In re Pegasus Agency, Inc., 101 F.3d 882, 886 2d Cir. 1996); In

re Woodbranch Energy Plaza One, Ltd., 44 B.R. 733, 736 (Bankr. S.D. Tex. 1984).  In this case,

both elements have been satisfied.

---

[7] PRIF has not received payment from the Debtors since January 2008.  The Debtors also stopped making mortgage payments to P II as of November 2008.  In addition, on February 13, 2009, PRIF was forced to provide a protective advance of $92,000 to fund critical operating expenses for the 2009 golf season.  (See McLain Aff., ¶32.)

### A.      The Debtors Lack Equity In The Property.

"Equity," for purposes of § 362(d)(2)(A), is the difference between the value of the

property and the sum of all claims which is secures.  See In re Diplomat Electronics Corp., 82

B.R. 668, 692 (Bankr. S.D.N.Y. 1988); In re DiDario, 232 B.R. 311, 313 (Bankr. D. N.J. 1999)

(quoting Matter of Cardell, 88 B.R. 627 (Bankr. D.N.J. 1988) ("The term 'equity' under Section

362(d)(2) has been defined by the majority of courts as the difference between the value of the

property and all encumbrances against it, including the interests of junior lien holders."); In re

Faires, 34 B.R. 549, 551 (Bankr. W.D. Wash. 1983); In re Jug End in Berkshires, Inc., 46 B.R.

892, 901 (Bankr. D. Mass. 1985); In re Dunes Casino Hotel, 69 B.R. 783, 793 (Bankr. D.N.J.

1986).  The secured party bears the burden of proving the debtor's lack of equity.  11 U.S.C.

§ 362(g)(1).  Dallas-Fort Worth Regional Airport Board v. Braniff Airways, Inc., 26 B.R. 628,

635 (N.D. Tex. 1982).

As set forth in Point II B above, no equity exists in the Mortgaged Property.  The

Appraisal Report demonstrates that the fair market value of the Golf Course Property ($15

million) is less than the Mortgagees' mortgage debt by approximately $6 million.  In addition,

the Appraisal Report confirms that the fair market value of the Development Property ($3.3

million) is less than the outstanding amount of PRIF's first mortgage by approximately $3.7

million.  There is no question that with respect to each parcel of the Mortgaged Property, the

value of secured liens is substantially greater than the fair market value of the parcel.  (See

McLain Aff., ¶ 37.)  In addition, the total amount of the Mortgagee's secured debt

(**$21,188,285.51**) well exceeds the fair market value of the Mortgaged Property (**$18.3 million**).

Because no equity exists in the Golf Course Property or Development Property, the Debtors have

no ability for reorganization.  Without relief from the stay, the Mortgagees' security interest will

be further diminished leaving the Mortgagees without any adequate recourse.

14

### B.      The Debtors Cannot Reorganize.

A debtor has the burden of proof of showing that the collateral is "necessary to an

effective reorganization."  This requires not only a showing that if there is conceivably to be an

effective reorganization, the Mortgaged Property will be needed for it, but also that the

Mortgaged Property are essential for an effective reorganization.  This means that there must be

"a reasonable possibility of a successful reorganization within a reasonable time."  See In re

Pegasus Agency, Inc., 101 F.3d 882, 886 (2nd Cir. 1996) (citing United Savs. Ass'n of Tex. v.

Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 108 S.Ct 626, 98 L. Ed. 2d 740 (1988)); In

re Cadwell's Corners Partnership, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994) (When a creditor

has shown that its claim is unsecured, the debtor must prove that the property is needed for an

effective reorganization).  A debtor's high hope of reorganizing is not enough to continue the

automatic stay over property in which the debtor has no equity.  See In re Playa Dev. Corp., 68

B.R. 549, 554 (Bankr. W.D. Tex. 1986); In re Island Helicopter Corp., 63 B.R. 809, 816 (Bankr.

E.D.N.Y. 1986) (citing In re Saypol, 31 B.R. 796 (Bankr. S.D.N.Y. 1983) ("The automatic stay

will remain operative only if the Debtor demonstrates that its prospects of an effective

reorganization are well founded...").

If reorganization is not reasonably possible, the mere fact that the property may be

indispensable to the debtor's hopes of reorganization will not justify a continuation of the stay.

Terra Mar Dev. Corp. v. Terra Mar Assoc. (In re Terra Mar Assoc.), 3 B.R. 462, 466 (Bankr. D.

Conn. 1980).  In Terra Mar, a mortgagee sought relief from the automatic stay to permit to

foreclose on its collateral. The debtor failed to show that it could refinance its operations, and the

Court concluded that there was no evidence of an ability to reorganize.  The Court thus held that

the collateral was not necessary to an effective reorganization, and it vacated the stay.  The Court

held, in pertinent part, as follows:

> The short of it is that the debtor is utilizing the...stay, hoping that
> somewhere, someone will fund an arrangement or refinance the
> mortgage with the plaintiff. This is entirely too slim a read upon
> which this Court should exercise its discretion and keep the
> plaintiff at bay while the debtor continues to pray.

Id. at 466. See also, In re Boca Dev. Assoc., 21 B.R. 624, 630 (Bankr. S.D.N.Y. 1982) ("An

'effective' reorganization means more than just that the debtor needs the property").

For over two (2) years, the Debtors have been in default of their financing obligations and

have been unable to demonstrate, with any consistency, an ability to refinance their obligations.

The deepening credit crisis renders any prospect of securing replacement financing in the near

future remote. In addition, the Debtors have failed to obtain final development approvals from

the Borough of River Vale with respect to the Development Property. The lack of final

approvals makes it extremely difficult for the Debtors to obtain replacement financing as to the

Development Property. Furthermore, the Debtors will not be able to "cram down" the

Mortgagees in any proposed plan of reorganization, and a plan of reorganization contemplating a

pay-off or refinancing of the secured debt is not realistic or confirmable.

### 1. The Debtors Also Cannot Reorganize Because They Have No Source of Income to Operate Their Business.

The receipts generated by the Golf Course Property consist mainly of: (i) green fees; (ii)

membership dues; (iii) golf outings; (iv) sale of golf apparel and equipment in the pro shop; and

(v) sale of food and beverages. During 2009, the Golf Course Property generated gross receipts

of approximately $2,871,050. (See Sinisi Aff., ¶12.)

Because the Debtors' only source of income is subject to absolute assignments of rents in

favor of the Mortgagees, the Debtors have no ability to fund a reorganization effort. A debtor

must own an interest in rents to be authorized to use them as cash collateral pursuant to Section

363(c) of the Bankruptcy Code. See 11 U.S.C. § 363(a) (defining cash collateral as "cash… in

16

which the estate and an entity other than the estate have an interest"); <u>Jason Realty</u>, 59 F.3d at

425 (holding that rents in which debtor has no interest are not available as cash collateral);

<u>MacArthur Executive Assocs. v. State Farm Life Ins. Co.</u>, 190 B.R. 189, 195 (D.N.J. 1995); <u>In re</u>

<u>Glen Props.</u>, 168 B.R. 537, 542 (D.N.J. 1993).

 Whether a debtor owns an interest in rents is determined according to state law.  <u>See</u>

<u>Butner v. United States</u>, 440 U.S. 48, 55 (1979).  Further, "[a]ssignments of rents are interests in

real property and, as such, are created and defined in accordance with the law of the situs of the

real property."  <u>Jason Realty</u>, 59 F.3d at 427 (citing <u>Butner</u>, 440 U.S. at 55).  Accordingly, New

Jersey law will govern whether the Debtor owns an interest in the rents from the Mortgaged

Property.

 Under New Jersey law, "[a]n absolute assignment [of rents] transfers title to the assignee

upon its execution."  <u>Jason Realty</u>, 59 F.3d at 427 (citing <u>New Jersey Nat'l Bank and Trust Co.</u>

<u>of Newark v. Wolf</u>, 108 N.J. Eq. 412 (1931)).  If an assignment is absolute, a debtor owns no

interest in rents and, therefore, cannot use those rents as cash collateral absent the assignee's

consent.  <u>Jason Realty</u>, 59 F.3d 423.

 The determination of whether an assignment of rents is absolute under New Jersey law

will turn on the language used to create the assignment.  <u>See</u> <u>Jason Realty</u>, 59 F.3d at 427

(stating "[t]he precise wording determines the effect of the assignment"); <u>In re Carretta</u>, 220 B.R.

203, 209 (D.N.J. 1998); <u>Woods Corp. Assocs. v. Signet Star Holdings, Inc.</u>, 910 F.Supp. 1019,

1029 (D.N.J. 1995) (recognizing that, "[d]etermining what language creates an absolute

assignment rather than a pledge for security depends on the precise wording of the assignment").

An assignment is absolute if its language demonstrates an intent to transfer immediately the

assignor's rights and title to the rents and if the parties mutually agree in words of the present to transfer full title to the rents. <u>Jason Realty</u>, 59 F.3d at 427.

An otherwise absolute assignment is not defeated simply because it is given as part of an overall financing transaction, even when the transaction also includes a concurrent pledge of the rents as security and where the assignment expressly states it is given to secure an outstanding debt. <u>Jason Realty</u>, 59 F.3d at 428 (stating "[w]e are not moved by the facts that the assignment was part of a financing transaction and served as additional security for repayment of the note"). Rather, a lender has the right to concurrently demand and independently enforce the rights afforded an assignee and mortgagee of rents as security for a loan. <u>See</u> <u>e.g.</u> <u>Caretta</u>, 220 B.R. at 212 (noting that "a mortgage may contain two independent remedies for the creditor").

Here, the Debtors' only source of income consists of the receipts and income derived from the Mortgaged Property. Those receipts are subject to an absolute Assignment of Rents which entitles the Mortgagees to the Debtors' right, title and interest in and to any and all rents, profits or other income generated from the Mortgaged Property. Paragraph 1 of the P II Assignment of Rents provides P II with a present, absolute assignment of leases, rents, income and other profits arising from the Golf Course Property. Specifically, the P II Assignment of Rents provides as follows:

> Assignor does hereby bargain, transfer, assign, convey, set over and deliver unto Assignee, all rights of the lessor under the above-described lease(s) and all other leases affecting the Premises, or any part thereof, now existing or which may be executed at any time in the future during the life of this Absolute Assignment…**It is intended hereby to establish a present and complete transfer of all Leases and all rights of the lessor thereunder and all the rents, and other payments arising thereunder on account of the use of the Premises unto Assignee, with the right, but without the obligation, to collect all of said rents, income and other payments which may become due during the life of this Absolute Assignment.**

18

(See McLain Aff., P II Assignment of Rents, Exh. C, p. 2.)

In addition, Section 2.13 of the Golf Club Mortgage, titled "Assignment of Leases and Rents," unequivocally provides PRIF with a present absolute assignment of all rents, profits, issues and revenues arising from the Golf Course Property.  Section 2.13 of the Golf Club Mortgage provides, in pertinent part, as follows:

> **Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in and to each Lease whether now existing or hereafter entered into, together with all rents, royalties, bonuses, issues, profits, revenues, occupancy charges, issues, profits and other benefits of Mortgagor** under the Leases (collectively, the "Rents") of each such Lease as further security for the payment and performance of the Obligations, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for security.

(See McLain Aff., Golf Club Mortgage, Exhibit H, p. 15).

In accordance with Third Circuit authority, the Assignment of Rents effectively divested the Debtors of any and all rights to the property's income and transferred same to the Mortgagees.  By virtue thereof, the Debtors have no available income to operate the Mortgaged Property.

Based on the controlling authorities set forth herein, the Debtors clearly have no ownership interest in the income derived from the Mortgaged Property and cannot use that income as cash collateral to fund their operating expenses.  The Debtors' inability to reorganize absent the use of that income does not compel a different result.

### IV.    THE RECEIVER SHOULD REMAIN IN POSSESSION OF INCOME DERIVED FROM THE PROPERTY AND BE EXCUSED FROM COMPLIANCE UNDER SECTION 543(d)(1) OF THE BANKRUPTCY CODE.

This Court should excuse the Receiver from any obligation to release to the Debtor's estate any rent or other property within its control pursuant to Section 543(d)(1) of the

Bankruptcy Code.  As an initial matter, and as explained above, the funds in the Receiver's custody constitute the Mortgagees' assets, <u>not</u> the assets of the Debtors and, therefore, the Receiver is under no obligation to release the funds to the Debtors.  In the unlikely event the Court were to determine that the income constitutes assets of the Debtors' estate (which is clearly not the case), the Receiver should nonetheless be excused from compliance.

Sections 543(a) and (b) of the Bankruptcy Code (the "Turnover Provisions") require a "custodian" to turn over to the bankruptcy trustee or debtor-in-possession any property of the debtor that is in the possession, custody or control of the custodian.  11 U.S.C. § 543(a) and (b); <u>Dill v. Dime Sav. Bank, FSB (In re Dill)</u>, 163 B.R. 221, 225 (E.D.N.Y. 1994).  The definition of "custodian" includes a state court-appointed receiver.  11 U.S.C. § 101(11).

Section 543(d)(1) of the Bankruptcy Code, however, provides that the bankruptcy court may, in its discretion, excuse a custodian's compliance with the Turnover Provisions "if the interests of creditors…would be better served by permitting a custodian to continue in possession…of such property."  11 U.S.C. § 543(d)(1); <u>Dill</u>, 163 B.R. at 225.  Section 543(d)(1) of the Bankruptcy Code has been interpreted to be a modified abstention provision akin to the Bankruptcy Code's general abstention provisions under Section 305.  <u>Dill</u>, 163 B.R. at 225.

Critically, the interests of the debtor are not relevant to the determination of whether to except a custodian from the Turnover Provisions.  <u>French Bourekas, Inc. v. Turner</u>, 199 B.R. 807, 819 (E.D.N.Y. 1996); <u>Dill</u>, 163 B.R. at 224 ("the interests of the Debtor, however, are not part of the criteria considered when applying section 543(d)(1); <u>In re Foundry of Barrington Partnership</u>, 129 B.R. 550, 558 (Bankr. N.D. Ill. 1991) ("… § 543(d) does not require or permit consideration of the interest of the debtor").  Rather, courts considering whether to excuse a receiver from the Turnover Provisions under Section 543(d)(1) have looked to several factors to

20

decide whether the interests of creditors would be better served by the continuation of the

receiver. Those factors include the following:

> (1) whether there will be sufficient income to fund a successful
> reorganization;
>
> (2) whether the debtor will use the property in question for the
> benefit of the creditors;
>
> (3) whether there has been mismanagement by the debtor;
>
> (4) whether or not there are avoidance issues raised with respect to
> the property (because the receiver does not possess avoiding
> powers for the benefit of the estate); and
>
> (5) the fact that the automatic stay had deactivated state court
> receivership action.

In re Constable Plaza Assocs., L.P., 125 B.R. 98, 103-104 (Bankr. S.D.N.Y. 1991); Dill, 163

B.R. at 225. Courts also consider the quality of the receiver's performance in deciding Section

543(d)(1) motions. In re KCC-Fund v. Ltd., 96 B.R. 237, 240 (Bankr. W.D. Mo. 1980); see also

In re Sundance Corp., 83 B.R. 746, 749 (Bankr. Mont. 1988) (continuing receiver who court

found "ably performed his duties"). Not all factors need to be present for a receiver to be

excused from the Turnover Provisions pursuant to Section 543(d)(1). See In re Lizeric Realty,

188 B.R. 499 (Bankr. S.D.N.Y. 1995).

Application of the relevant factors support excusing the Receiver from the Turnover

Provisions. As a threshold matter, the Debtors lack sufficient income to fund a successful

reorganization. As set forth above, the Debtors' sole source of income is derived from the

Mortgaged Property which is subject to the absolute Assignment of Rents in favor of the

Mortgagees. Those receipts and income, therefore, are not property of the Debtors' estates under

Section 541(a) of the Bankruptcy Code and cannot be used by the Debtors to fund their

purported "reorganization effort." Those funds are also unavailable for the benefit of creditors.

The Receiver has been utilizing the income and receipts to pay the operating expenses of the
Golf Course Property in the ordinary course.

It is in the best interest of creditors and the estates that the Receiver remain in possession
and control of the Mortgaged Property and continue to collect income during the pendency of
these bankruptcy cases.  The Receiver has performed successfully as manager of the Mortgaged
Property for more than a year and has consistently collected all income and ensured that the
Mortgaged Property is properly maintained and operated.  The Debtors should simply not be
permitted to operate and assume possession of the Mortgaged Property which they have not
maintained in more than a year.

During the past fourteen (14) months, the Receiver and his management group have
expended considerable time and effort in resolving the Debtors' past due invoices owed to key
vendors and suppliers and developing and implementing a new financial management system
that is critical to the operations of the golf course.  The Receiver and his management group have
acquired considerable knowledge regarding the operations of the golf club and have improved
the club's relations with essential vendors and suppliers.  (See Sinisi Aff. ¶16).  A change in the
court-appointed manager of the Golf Course Property, and the resulting time required for a new
management team to become familiar with the club and its vendors, could result in both a delay
in the opening of the club for the 2010 season and impair the viability and operations for the
2010 season.

Moreover, the Debtors and their principal, Kwang Keh ("Keh"), have demonstrated a
propensity to engage in disruptive and malicious conduct specifically designed to interfere with
the Receiver's management and operation of the Mortgaged Property.  (See Leyva Aff., ¶ 9 and
Exhibits D and E.)  The Debtors and Keh have attempted to divert the Golf Course Property's

receipts in violation of the Receiver's directions.  The Debtors and Keh have also attempted to

implement management decisions without the Receiver's approval to the substantial detriment of

golf course operations and its profitability. The Court should <u>not</u> reward the Debtors for their

blatant interference and disregard of the Receiver's orders and directives by permitting the

Debtors to gain control of the receipts and income generated by the Mortgaged Property, which

constitute the Mortgagees' collateral pursuant to the absolute Assignment of Rents.

**V.      ASSUMING THE INCOME IS PROPERTY OF THE
         DEBTORS' ESTATES, THOSE FUNDS CONSTITUTE
         MORTGAGEES' CASH COLLATERAL AND MUST BE
         <u>DEPOSITED INTO A SEGREGATED ACCOUNT.</u>**

In the unlikely event the Court determines that the funds in the Receiver's possession

constitute property of the Debtors' estate, those receipts and income would nonetheless be

unavailable to the Debtors and would be deemed to be the Mortgagees' cash collateral.  Absent a

Court Order or written consent of the Mortgagees, the Debtors are strictly prohibited from using,

selling or releasing any cash collateral pursuant to 11 U.S.C. §363(c)(2).  To the contrary, any

funds generated from the Mortgaged Property must be deposited in a segregated account under

the Mortgagees' control.

Section 363(c)(2) of the Bankruptcy Code provides in relevant part, as follows:

> (2)      The trustee may not use, sell, or lease cash collateral under
> paragraph (1) of this subsection unless -
>
> (A) each entity that has an interest in such cash collateral consents;
> or
>
> (B) the court, after notice and a hearing, authorizes such use, sale,
> or lease in accordance with the provisions of this section.

Section 363(e) of the Bankruptcy Code states:

> Notwithstanding any other provision of this section, at any time, on
> request of an entity that has an interest in property used, sold, or
> leased, or proposed to be used, sold, or leased, by the trustee, the

23

> court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

Under § 363(a), cash and cash equivalents including rents or profits subject to a security interest as provided in § 552(b) constitutes cash collateral.  See, ABN AMRO Bank N.V. v. Carmania Corp. N.V., (In re Carmania Corp., N.V.), 154 B.R. 160, 165 (Bankr. S.D.N.Y. 1993); In re Northport Marina Assoc., 136 B.R. 903 (Bankr. E.D.N.Y. 1992); In re Flower City Nursing Home, Inc., 38 B.R. 642, 645 (Bankr. W.D.N.Y. 1984).

The Mortgagees, at the very least, have a security interest in the receipts derived from the Mortgaged Property which constitute the Mortgagees' cash collateral.  The Debtors must be restrained from using any income in the operation of the Mortgage Property absent authorization from this Court.  The Debtors simply have no means to provide the Mortgagees with adequate protection.  Accordingly, in the event the Court determines that the funds in the Receiver's possession constitute property of the Debtors' estate, those monies should be deposited into a segregated account.

## <u>CONCLUSION</u>

These Chapter 11 proceedings were filed in bad faith and constitutes an eleventh-hour attempt by the Debtors to derail the Mortgagees' legitimate efforts to foreclose on the Mortgaged Property.  For all of the foregoing reasons, the Mortgagees respectfully request that the Court enter an Order: (a) dismissing the Debtors' Chapter 11 petitions pursuant to 11 U.S.C. § 1112(b) or, alternatively, (b) granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d); (c) excusing the Receiver from compliance under 11 U.S.C. § 543(d); and (d) prohibiting, to the extent applicable, the Debtors from use of cash collateral pursuant to 11 U.S.C. § 363(c)(2) and (e).

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for PRIF II Chemtek, LLC and P II
River Vale GC Funding, LLC


By:    /s/ *Leo V. Leyva*
          Leo V. Leyva
          James T. Kim

DATED:  February 5, 2010