**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Leo V. Leyva, Esq.
James T. Kim, Esq.
Attorneys for PRIF II Chemtek, LLC and P II River Vale GC Funding, LLC

|  |  |
|---|---|
| | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY |
| | Chapter 11 |
| In re: | CASE NO.  10-13393 (DHS) |
| | (Jointly Administered) |
| CHEMITEK 2006, LLC d/b/a River Vale Country Club, et al, | |
| | **HEARING DATE AND TIME:** |
| | March 22, 2010 at 2:00 p.m. |
| Debtors. | |
| | **ORAL ARGUMENT REQUESTED** |

---

**PRIF II CHEMTEK, LLC AND P II RIVER VALE GC FUNDING, LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR ENTRY OF AN ORDER (A) DISMISSING THE DEBTOR'S CHAPTER 11 PETITION PURSUANT TO 11 U.S.C. § 1112(b) OR ALTERNATIVELY, (B) GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d); (C) EXCUSING RECEIVER FROM COMPLIANCE UNDER 11 U.S.C. § 543(d); AND (D) PROHIBITING, TO THE EXTENT APPLICABLE, THE DEBTOR FROM USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2) AND (e)**

---

Of Counsel and On the Brief:
    Leo V. Leyva
On the Brief:
    James T. Kim

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS .......................................................................................................6

LEGAL ARGUMENT.............................................................................................................7

I.     THE DEBTORS' BAD FAITH CHAPTER 11 PETITIONS SHOULD BE
DISMISSED. ................................................................................................ 7

     A.     There Is No Equity In The Mortgaged Properties To Satisfy The
Mortgagees' Secured Debt...................................................... 10

II.     IN THE EVENT THIS COURT IS DISINCLINED TO DISMISS
DEBTORS' PETITIONS, THE AUTOMATIC STAY SHOULD BE
LIFTED PURSUANT TO 11 U.S.C. § 362(D)(1). .............................................. 13

     A.     Stay Relief Should Be Granted Based On The Debtors' Bad Faith
Filings. .................................................................................... 13

     B.     Stay Relief Is Necessary To Preserve The Mortgagees' Security
Interest...................................................................................... 13

     C.     Mortgagees Are Entitled To Relief From The Automatic Stay
Pursuant to 11 U.S.C. § 362(d)(2). .......................................... 14

     D.     RVCC's Receipts And Revenues Constitute The Mortgagees'
Collateral And Therefore The Debtors Have No Source Of Income
To Fund These Proceedings................................................... 17

          1.     Under 363 of the Bankruptcy Code, the Debtors May Not
Use the Cash Collateral Without Mortgagees' Consent And
Debtors Cannot Meet Their Burden of Establishing That
Mortgagees are Adequately Protected. ......................... 21

          2.     There Is No Equity Cushion To Support The Debtors'
Request For Use Of Cash Collateral............................. 24

III.     THE RECEIVER SHOULD BE PERMITTED TO CONTINUE THE
MANAGEMENT AND OPERATION OF THE GOLF COURSE
PROPERTY AND BE EXCUSED FROM COMPLIANCE UNDER
SECTION 543(D)(1) OF THE BANKRUPTCY CODE..................................... 26

CONCLUSION....................................................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

In re 15375 Memorial Corporation, 589 F.3d 605 (3d Cir. 2009)....................................7

In re 234-6 West 22 Street Corp., 214 B.R. 751 (Bankr. S.D.N.Y. 1997).......................13

In re Aliquippa Machine Co., Inc., 343 B.R. 145 (Bankr. W.D. Pa. 2006)....................12

In re Behanna, 381 B.R. 631 (Bankr. W.D. Pa. 2008)...................................................12

In re Berens, 41 B.R. 524 (Bankr. D. Minn. 1984)........................................................23

In re Blehm Land and Cattle Co., 859 F.2d 137 (10th Cir. 1988)..................................23

In re Boca Dev. Assoc., 21 B.R. 624 (Bankr. S.D.N.Y. 1982)........................................15

In re C-TC 9th Ave. Partnership, 113 F.3d 1304 (2d Cir. 1997).....................................8

In re Cadwell's Corners Partnership, 174 B.R. 744 (Bankr. N.D. Ill. 1994).................15

In re Century/ML Cable Venture, 294 B.R. 9 (Bankr. S.D.N.Y. 2003) ...........................7

In re Constable Plaza Assocs., L.P., 125 B.R. 98 (Bankr. S.D.N.Y. 1991).....................27

Dill v. Dime Sav. Bank, FSB (In re Dill), 163 B.R. 221 (E.D.N.Y. 1994) ......................27

First County National Bank And Trust Company v. Canna, 124 N.J. Super. 154 (App.
    Div. 1973) ...............................................................................................................18

French Bourekas, Inc. v. Turner, 199 B.R. 807 (E.D.N.Y. 1996) .................................27

In re Gilbert Broadcasting Corp., 54 B.R. 2 (Bankr. D.N.J. 1984)................................7

In Re Hart Ski Mfg. Co., Inc., 9 B.R. 397 (Bankr. D. Minn. 1981) ..............................23

In re Heatron, 6 BR. 493 (Bankr. W.D. Mo. 1980) ......................................................21

In the Matter of Sundale Assocs., Ltd., 48 B.R. 288 (S.D. Fla. 1984) ...........................7

In re Island Helicopter Corp., 63 B.R. 809 (Bankr. E.D.N.Y. 1986)............................15

In re KCC-Fund v. Ltd., 96 B.R. 237 (Bankr. W.D. Mo. 1980).....................................27

In re Kessler, 76 B.R. 434 (Bankr. E.D. Pa. 1987) ......................................................14

In re Kingston Square Assocs., et al., 214 B.R. 713 (Bankr. S.D.N.Y. 1997).................................7

In re Little Creek Dev. Co., 779 F.2d 1068 (5th Cir. 1986) ...........................................................8

In re Maple Contractors, Inc., 172 N.J. Super. 348 (Law Div. 1979)............................................19

In re Martin, 761 F.2d 472 (8th Cir. 1985) ..................................................................................22

Matter of Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444 (Bankr. D.N.J. 1993) .............7, 8

In re Melior, 734 F.2d 1396 (9th Cir. 1984) ................................................................................25

In re Metromedia Fiber Network, Inc., 290 B.R. 487 (Bankr. S.D.N.Y, 2003) ............................21

In re Mosello, 195 B.R. 277 (Bankr. S.D.N.Y. 1996) ...................................................................24

In re O'Connor, 808 F.2d 1393 (10th Cir. 1987)..........................................................................22

In re Pegasus Agency, Inc., 101 F.3d 882, 886 (2d Cir. 1996)...............................................14, 15

In re Pegasus Agency, Inc., 186 B.R. 597 (S.D.N.Y. Bankr. 1995) ..............................................12

In re Phoenix Piccadilly, Ltd., 849 F.2d 1393 (11th Cir. 1988) ....................................................8

In re Playa Dev. Corp., 68 B.R. 549 (Bankr. W.D. Tex. 1986)......................................................15

In re Robbins, 964 F.2d 342 (4th Cir. 1992)................................................................................13

In re Saypol, 31 B.R. 796 (Bankr. S.D.N.Y. 1983) .......................................................................15

In re SB Properties, Inc., 185 B.R. 198 (Bankr. E.D. Pa. 1995)......................................................8

In re Sundance Corp., 83 B.R. 746 (Bankr. Mont. 1988) .............................................................27

In re Swedeland Dev. Group. Inc., 16 F.3d 552 (3d Cir. 1994)...............................................22, 23

Terra Mar Dev. Corp. v. Terra Mar Assoc. (In re Terra Mar Assoc.), 3 B.R. 462 (Bankr.
    D. Conn. 1980)......................................................................................................................15

In re The Ad Brite Corp., 290 B.R. 209 (Bankr. S.D.N.Y. 2003) ...................................................7

Trident Assocs. v. Metro Life Ins. Co., 52 F.3d 127 (6th Cir. 1995) ............................................12

United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 108
    S.Ct 626, 98 L. Ed. 2d 740 (1988) ........................................................................................15

In re Wilson, 116 F.3d 87 (3d Cir. 1997).....................................................................................12

In re Woodbranch Energy Plaza One, Ltd., 44 B.R. 733 (Bankr. S.D. Tex. 1984)........................14

## **PRELIMINARY STATEMENT**

This Reply Memorandum of Law is submitted in further support of the motion of PRIF II

Chemitek, LLC ("PRIF") and P II River Vale GC Funding, LLC ("P II" which, together with

PRIF are collectively referred to as the "Mortgagees") seeking, among other relief, an Order: (a)

dismissing the Chapter 11 petitions of Chemitek 2006 LLC ("Chemitek") and Palisades Park

Plaza North, Inc. ("Palisades" which, together with Chemitek are collectively referred to as the

"Debtors") pursuant to 11 U.S.C. § 1112(b) or, alternatively, (b) granting relief from the

automatic stay pursuant to 11 U.S.C. § 362(d).  In addition, the Mortgagees seek an Order

excusing Stephen Sinisi, Esq. (the "Receiver"), a state court-appointed receiver, from the

mandate of the automatic stay pursuant to 11 U.S.C. § 543(d) and prohibiting, to the extent

applicable, the Debtors from use of cash collateral pursuant to 11 U.S.C. § 363(c)(2) and (e).

The Debtors' opposition papers unequivocally confirm that the Debtors have no

possibility of confirming a reorganization plan that will result in the satisfaction of the

substantial indebtedness owed to the Mortgagees.  The Debtors do not dispute that they filed

their Chapter 11 petitions two (2) hours before the scheduled foreclosure sale of the River Vale

Country Club (the "Golf Course Property" or "RVCC") and adjacent development parcel (the

"Development Property") (collectively, the "Mortgaged Properties").  The Debtors only hope of

restructuring the Mortgagees' secured debt is based entirely on the potential "wishes" of a

Korean investment group known as NextValue, which has expressed an alleged willingness to

invest $16 million to restructure the Mortgagees' debt _and_ construct the residential units at the

Development Property.  That purported investment, however, would only be made **_after_** the

issuance of final site plan approvals by the Borough of River Vale ("Borough"), which could

take many months, if not years, to obtain.

Notwithstanding the fact that NextValues' investment agreement with Chemitek confirms that NextValue has <u>not</u> guarantied any purported "investment," the Debtors insist that NextValue is the solution to the satisfaction of the Mortgagees' indebtedness.  Even if NextValue is committed to an investment (which is clearly not the case), NextValue's $16 million proposal simply is <u>not</u> enough to satisfy the secured debt which exceeds $21 million.[1]

More importantly, the Mortgagees hold a valid security interest in all of the Debtors' assets including RVCC's cash receipts and revenues.  The Debtors, therefore, have no ability to use the Mortgagees' cash collateral to fund its reorganization efforts and to pay their professionals.  The Debtors also lack the financial wherewithal to adequately protect the Mortgagees' collateral during the pendency of this insolvency proceeding.  Simply stated, there is no money to fund the Debtors' Chapter 11 proceeding which essentially involves a dispute between the Debtors and its two (2) secured creditors.

In a disingenuous effort to delay the Mortgagees' right to foreclose, the Debtors claim that the Mortgaged Properties are collectively valued in excess of $33 million.  The Debtors' valuations are based on July 2008 appraisal reports, which do not reflect current real estate prices and the uncertainties of today's credit markets.  As demonstrated in detail in the Rebuttal Reports of John McChesney ("McChesney") of Swift Real Estate Solutions, the Debtors' 2008 appraisal reports contain numerous flaws, violate the Uniform Standards of Professional Appraisal Practice and do <u>not</u> accurately reflect the current fair market value of the subject properties in today's declining real estate market.  Rather, McChesney opines that the current fair market values of the Mortgaged Properties have not increased in value from their September 2006

---

[1] The indebtedness owed on the P II loans was $14,187,524.41 as of February 1, 2010, and is accruing interest at the default rate.  The indebtedness owed on the PRIF loan was $7,000,761.10 as of February 2, 2010.

appraised values.  As of September 2006, McChesney determined that the Golf Course Property

had a value of $15 million and that the Development Property had a value of $3.3 million.  In

fact, NextValue's investment offer of $16 million for the restructuring of the secured debt and

construction of the residential units unequivocally establish that the Mortgaged Properties are not

currently worth $33 million.

Moreover, the Debtors conveniently ignore the fact that they have failed to take the

necessary steps during the past two (2) years to materially advance their site plan approval

application for the Development Property.  As demonstrated in detail in the Reply Affidavit of

David McLain ("McLain Reply Affidavit"), the Debtors are required to complete and satisfy a

host of requirements and items before proceeding to a site plan approval hearing before the

Borough.  Before the Debtors can proceed to a final site plan approval hearing, the Debtors are

required to: (i) pay the outstanding real estate taxes to the Borough; (ii) pay their engineer,

architect and land use attorney for past due invoices and for the necessary services to complete

the application process; (iii) address all of the open items requested by the Borough's engineer,

which are set forth in a letter dated March 6, 2009, to the Debtors;[2] and (iv) comply with all of

the terms of a certain Proposed Purchase Agreement dated March 3, 2008 (the "Proposed

Purchase Agreement") including, but not limited to, the Debtors' purchase a certain parcel

located at the center of the proposed development project from the Borough, and transfer of a

---

[2] Notwithstanding the fact that the Debtors received this letter in March 2009, the
Debtors failed to provide disclose the existence of this letter to the Receiver and Mortgagees.
The Mortgagees first learned of the existence of this letter and the list of open items requested by
the Borough engineer in November 2009.

certain parcel of the Golf Course Property to the Borough for the purpose of constructing a

soccer field.[3]

        As a result of the Debtors' utter failure to address any of these important items and

issues, NextValue's purported advance of $40,000 to the Debtors' engineer will not substantively

advance the Debtors' approval process.  Rather, the payment will increase the amount of the

unsecured debt while providing no real value to the estate.  The Court, therefore, should deny the

Debtors' cross-motion to approve the Debtors' request to obtain $40,000 in unsecured credit

from NextValue.

        The undisputable facts and documentary evidence demonstrate that the Debtors are

improperly using the Chapter 11 process to delay and derail the Mortgagees' rights to proceed

with their foreclosure of the Mortgaged Properties.  The sworn affidavits and documentary

proofs also demonstrate that the Debtors' principal, Kwang Keh ("Keh"), engaged in numerous

wrongful acts to interfere with the Receiver's management and operation of RVCC including the

diversion of funds for his personal gain.  Keh also has been the subject of several lawsuits from

purported investors and "silent partners" who claim that Keh defrauded them out of millions of

dollars based on intentional misrepresentations and deception.  This Court should not permit

Keh, who has unclean hands, to improperly use this proceeding to cause further harm to the

Mortgagees and jeopardize their security interest in the subject collateral.  A continuation of the

Debtors' Chapter 11 proceeding will undoubtedly result in an administratively insolvent estate.

---

        [3] The Debtors failed to take any of the necessary steps to prepare the "land swap"
agreement, land conversation agreement and other related documents required by the Proposed
Purchase Agreement.  In fact, the Debtors have failed to prepare a construction budget and have
failed to provide any viable construction financing options with respect to the completion of the
townhouse development project.

As the record also confirms, but for the decisive actions taken by the Receiver and his property manager (Harvey Young) to effectively resolve the substantial unpaid invoices owed to RVCC's vendors and suppliers before the beginning of the 2009 golf season, RVCC's operations would have likely been jeopardized by Keh's gross mismanagement and abuse of the club's receipts and revenues. To the extent the Court is not inclined to dismiss the Debtors' petitions (or grant relief from the automatic stay), the Court should permit the Receiver and his property manager to continue with the management and operation of RVCC throughout these proceedings. A change in RVCC's management at the critical stage of opening the club for the 2010 golf season likely will cause irreparable harm to RVCC's operations and the Mortgagees' collateral.

For these reasons, those set forth in Mortgagees' moving pleadings, and those set forth below, it is respectfully requested that the Court grant the Mortgagees' motion to dismiss the Debtors' Chapter 11 petitions or, alternatively, afford the Mortgagees relief from the automatic stay and excuse the Receiver from compliance under the turnover provisions of the Bankruptcy Code under 11 U.S.C. § 543(d). The Court should also deny the Debtors' cross-motion to approve the Advance Agreement with NextValue and to use cash collateral pursuant to 11 U.S.C. § 363.

## <u>STATEMENT OF FACTS</u>

The relevant Statement of Facts are set forth in the accompanying Affidavits of David McLain, John McChesney, Harvey Young, Stephen P. Sinisi and Affirmation of Leo V. Leyva, and Reply Affidavit of David McLain, together with exhibits annexed thereto.  For the sake of brevity, those facts will not be repeated below, but are incorporated by reference.

## LEGAL ARGUMENT

### I.    THE DEBTORS' BAD FAITH CHAPTER 11 PETITIONS SHOULD BE DISMISSED.

Contrary to the Debtors' contentions, these Chapter 11 petitions were filed in bad faith and designed solely to derail the February 5, 2010, foreclosure sale of the Mortgaged Properties. Because the Debtors have failed to properly invoke the protections of the Bankruptcy Code, the Debtors' Chapter 11 petitions should be dismissed.

The bankruptcy court has wide discretion to dismiss a Chapter 11 case under any of the grounds enumerated in 11 U.S.C. § 1112(b). See In re 15375 Memorial Corporation, 589 F.3d 605, 626 (3d Cir. 2009) (holding that there was ample evidence to support the district court's determination that the debtors' bankruptcy petitions did not serve valid bankruptcy purposes but, instead, were filed primarily as a litigation tactic and therefore in bad faith); In re Century/ML Cable Venture, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003); In re The Ad Brite Corp., 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003); In re Kingston Square Assocs., et al., 214 B.R. 713, 724 (Bankr. S.D.N.Y. 1997); Matter of Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 448 (Bankr. D.N.J. 1993), aff'd, 155 B.R. 93 (D.N.J. 1993) (citing In re Gilbert Broadcasting Corp., 54 B.R. 2, 4 (Bankr. D.N.J. 1984)); In the Matter of Sundale Assocs., Ltd., 48 B.R. 288, 290 (S.D. Fla. 1984).

In determining whether a debtor has instituted a bad faith filing, courts consider the following non-exclusive factors including, without limitation:

> (1)    Whether the debtor has only one asset;
>
> (2)    Whether the debtor has few unsecured creditors whose claims are small in relation to the secured creditors;
>
> (3)    Whether the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default;

(4)     Whether the debtor's financial condition reflects in essence, a two party dispute between the debtor and the secured creditor which can be resolved in the pending foreclosure action;

(5)     Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)     Whether the debtor has little or no cash flow;

(7)     Whether the debtor lacks the possibility of reorganization; and

(8)     Whether the debtor has any employees.

See Y.J. Sons & Co., Inc., 212 B.R. 793, 802 (Bankr. D.N.J. 1997); In re C-TC 9th Ave. Partnership, 113 F.3d 1304, 1311 (2d Cir. 1997); In re Phoenix Piccadilly, Ltd., 849 F.2d at 1394-95; In re SB Properties, Inc., 185 B.R. 198, 205 (Bankr. E.D. Pa. 1995); In re Little Creek Dev. Co., 779 F.2d 1068, 1072-1073 (5th Cir. 1986).  These factors or indicia of bad faith should not, however, be rigidly applied, but viewed broadly in the light of the circumstances of a particular case.  See Newark Airport/Hotel, 156 B.R. at 448; see also Y.J. Sons & Co., 212 B.R. at 802 (quoting In re Little Creek Dev. Co., 779 F.2d at 1072) ("Findings of lack of good faith…have been predicated on certain recurring but non-exclusive patters, and they are based on a conglomerate of factors rather than any single datum.").

Here, the facts and circumstances demonstrate that the Debtors have instituted bad faith filings to wrongfully derail the Mortgagees' foreclosure proceedings.  There is no question that the Debtors' primary asset is the Mortgaged Properties.  The Debtors have very few unsecured creditors (totaling approximately $230,000) whose claims are extremely small in relation to the Mortgagees' secured claims in excess of $21 million.[4]  The timing of the Debtors' filings clearly

---

[4] In fact, Palisades Park has identified only two (2) other creditors, the Internal Revenue Service and State of New Jersey, without any indication of the purported amount of their claims. (continued…)

demonstrates their intent to frustrate the Mortgagees' enforcement of their rights.  The Debtors'

filed their Chapter 11 petitions two (2) hours before the scheduled Sheriff's sale.

More importantly, the Debtors simply lack any possibility of reorganization that will

result in the satisfaction of the Mortgagees' secured debt or any payment whatsoever to

unsecured creditors.  The Debtors disingenuously rely on NextValue's purported Investment

Agreement which contemplates a potential investment of $16 million to "restructure" the

mortgage debt and construct the residential units at the Development Property.[5]  The Advance

Agreement confirms that the contemplated investment of $16 million is purportedly being made

to acquire and/or restructure the entire mortgage debt and build the residential units at the

Development Property.[6]  NextValue's contemplated investment of $16 million is simply not

enough to satisfy the substantial indebtedness owed to the Mortgagees.  Because there is no

question that the Debtors have no viable reorganization plan utilizing NextValue's proposal for

(…continued)
Most of the unsecured creditors identified in Chemitek's petition relate directly to those
purported investors that Keh defrauded and are the subject of pending adversary proceedings
against Keh, personally, in connection with his personal Chapter 11 proceeding (Case No. 09-
28922-DHS).

[5] At a meeting between the Mortgagees and NextValue on January 25, 2010, the
purported Executive Vice Chairman of NextValue confirmed that NextValue did not have $16
million and that they would have to form an investment group with other Korean partners to
make the contemplated investment, which would also require governmental approval to make
this investment in the United States.  The purported Executed Vice Chairman of NextValue also
confirmed that his group had not yet commenced any due diligence of the project and had not
visited the project in River Vale, New Jersey.  (See McLain Reply Aff., ¶ 32.)

[6] Based on the Mortgagees' conservative estimates, the townhouse development project
will likely require hard costs of approximately $16,313,550, soft costs of approximately
$3,090,200, and site work costs of approximately $1,390,590, to complete the construction of the
residential units (totaling in excess of $21 million or $355,582 per unit).  (See McLain Reply
Aff., Exh. Q.)  At the Debtors' §341 meeting, Keh testified that he had estimated (without ever
having presented a project budget) that it would cost approximately $25 million to complete the
townhouse project.

9

potential investment of $16 million <u>after</u> the issuance of final site plan approvals, the Court

should dismiss the Debtors' Chapter 11 petitions.[7]

In addition, the Investment Agreement expressly provides that NextValue only "wishes to

participate in the project and operation of River Vale by arranging and/or providing necessary

financing to Chemitek for the project," but does not provide that NextValue will actually provide

the necessary funding to restructure the entire mortgage debt.  Rather, the agreement implies that

NextValue may be acting as a mere arranger or partial investor in the project.  Section 4.4 of the

Investment Agreement also expressly provides that NextValue does not guarantee the financing

to Chemitek in any manner. [8]  (<u>See</u> McLain Aff., ¶ 36-37.)

### A.    There Is No Equity In The Mortgaged Properties To Satisfy The Mortgagees' Secured Debt.

In addition, there is no equity in the Mortgaged Properties that could possibly support the

Debtors' reorganization efforts.  As demonstrated in the McChesney Affidavit, the Debtors'

contention that the Mortgaged Properties are currently valued in excess of $33 million is simply

unsupportable.  McChesney's Rebuttal Reports unequivocally demonstrate that the Debtors'

appraiser failed to comply with well recognized appraisal standards and did <u>not</u> apply the proper

---

[7] As demonstrated in detail in the McLain Affidavit, NextValue's Investment Agreement contains numerous flaws which further demonstrate that NextValue is not committed to restructuring the Mortgagees' substantial mortgage debt.  For instance, while there is no dispute that Chemitek and Palisades Park jointly own the Golf course Property and Development Property, Palisades Park is <u>not</u> a party to the Investment Agreement or the Advance Agreement.

[8] Section 5 (v) of the Investment Agreement falsely states that "Chemitek has acquired all of the required governmental approvals and permits for the development of the town house at the site." (<u>See</u> Investment Agreement, §5(b), McLain Reply Aff., Exh. L.)  Chemitek's representation in §5(b) of the Investment Agreement is completely false and constitutes ground for termination of the agreement pursuant to §7.1(c).  The Debtors' pending Chapter 11 proceeding also constitutes grounds for termination of the Investment Agreement pursuant to §7(d) of the agreement.

methodology for valuing the Golf Course Property and Development Property.  In fact, the

Debtors' appraiser failed to use the income valuation approach in valuing the Golf Course

Property, which clearly is an income producing property.  The Debtors' appraiser also

improperly relied on golf course sales to government agencies which do not represent arms'

length transactions.  (See McChesney Aff., ¶ 3.)  While the Debtors' appraiser identifies several

sales of golf course properties to government agencies, he does not identify the sale of the Valley

Brook Country Club in River Vale, New Jersey, to Bergen County, in March 2006, for

$10,000,000.  The Valley Brook Country Club is located less than two (2) miles from the Golf

Course Property.  See id. at ¶ 4.

   In addition, the Debtors' appraiser made inapplicable assumptions regarding the

construction costs and inappropriately valued the proposed townhouse development project

based on a lump sum analysis which is not recognized as a correct application of industry

standards as indicated by leading appraisal standards.  Simply stated, a townhouse construction

property cannot be valued under the assumption of lump sums, because feasibility could pass or

fail with the expectations and timing of construction expenses versus sales.[9]  See id. at ¶ 5.

   McChesney opines that the Golf Course Property and Development Property have not

increased in value from their September 2006 values.  As of September 2006, the Golf Course

Property was appraised for $15 million and the Development Property was appraised for $3.3

million.  Because there are numerous flaws with the Debtors' appraisal reports, the Court should

---

[9] The Proposed Purchase Agreement requires the Debtors to purchase from the Borough a
certain parcel located at the center of the proposed development.  Given Keh's substantial delay
in advancing the development project and his failure to pay outstanding real estate taxes, the
Mortgagees are concerned that the Borough may not convey this piece of property which is
critical to the proposed townhouse project.

11

disregard those reports which do no reflect the current fair market values of the Mortgaged

Properties and the declining real estate prices in today's uncertain and difficult financial markets.

In the event the Court is inclined to consider the Debtors' appraisal reports, the Court

should schedule a hearing to address the current fair market value of the Mortgaged Properties.

See In re Behanna, 381 B.R. 631, 644-46 (Bankr. W.D. Pa. 2008) (conducting an evidentiary

hearing with expert testimony on fair market value of the subject bowling alley property and

holding that the debtor lacked equity in the subject property and, therefore, relief from the

automatic stay was appropriate under Section 362(d)); In re Aliquippa Machine Co., Inc., 343

B.R. 145, 150 (Bankr. W.D. Pa. 2006) (adjourning the secured lender's stay relief motion to

conduct an evidentiary hearing as to the value of the debtor's assets); In re Pegasus Agency, Inc.,

186 B.R. 597, 598 (Bankr. S.D.N.Y. 1995) (holding an evidentiary hearing on the value of the

debtor's property, concluding that the mortgage lien and foreclosure judgment substantially

exceeded the value of the property and that the debtor had no equity in the property and,

therefore, granting the mortgagee's motion to lift the automatic stay).  Considering there is no

equity in the Mortgaged Properties and the Debtors lack the financial wherewithal to provide

adequate protection to the Mortgagees, the Court should not permit this Chapter 11 to proceed.

Application of these controlling factors overwhelmingly mandates the dismissal of the

Debtors' Chapter 11 petitions.  The "totality of the circumstances" confirms the Debtors have

instituted these Chapter 11 proceedings in bad faith solely to abuse the judicial process and

prevent the foreclosure of the Mortgaged Property.  For all of the aforementioned reasons, it is

respectfully requested that the Court grant the Mortgagees' motion to dismiss the Debtors'

Chapter 11 proceedings pursuant to 11 U.S.C. § 1112(b).

## II.   IN THE EVENT THIS COURT IS DISINCLINED TO DISMISS DEBTORS' PETITIONS, THE AUTOMATIC STAY SHOULD BE LIFTED PURSUANT TO 11 U.S.C. § 362(D)(1).

In these cases, cause exists under Section 362(d)(1) of the Bankruptcy Code to vacate the automatic stay because, as established in greater detail above, the Debtors filed their Petitions in bad faith.  See In re Wilson, 116 F.3d 87, 90 (3d Cir. 1997) (citing Trident Assocs. v. Metro Life Ins. Co., 52 F.3d 127 (6th Cir. 1995)) (holding the Bankruptcy Code does not define the term "cause," leaving courts to "consider what constitutes cause based on the totality of the circumstances in each particular case"); In re Robbins, 964 F.2d 342, 345 (4th Cir. 1992) (holding the decision to lift the automatic stay under Section 362(d)(1) is within the sound discretion of the court).  Further mandating stay relief is the fact the Mortgagees' security interest in the Mortgaged Properties is not adequately protected and will only continue to erode by virtue of the hostile and uncertain market conditions.

### A.   Stay Relief Should Be Granted Based On The Debtors' Bad Faith Filings.

As stated in more detail above, most (if not all) of the factors indicative of a bad faith bankruptcy filing are present here.  These bad faith filings, alone, constitute sufficient cause to lift the automatic stay pursuant to Section 362(d) of the Bankruptcy Code.  See In re 234-6 West 22 Street Corp., 214 B.R. 751 (Bankr. S.D.N.Y. 1997) (holding that "the standards for bad faith as evidence of cause," whether in the context of dismissal or relief from the stay, "are not substantively different from each other").

### B.   Stay Relief Is Necessary To Preserve The Mortgagees' Security Interest.

Absent dismissal of the Debtors' petitions or immediate stay relief, the Mortgagees' security interest in the Mortgaged Properties will be substantially diminished by virtue of

declining market values, leaving the Mortgagees without any adequate protection.  There is no question that the total amount of the Mortgagee's secured debt **($21,188,285.51)** as of February 1, 2010) well exceeds the current fair market value of the Mortgaged Properties.  The Debtors' contention that the Mortgaged Properties are currently valued in excess of $33 million is absurd and based on a flawed analysis of real estate values as of July 2008, before the collapse of the financial and credit markets in the United States.  In fact, as demonstrated in detail in McChesney's Rebuttal Report, the Debtors' appraiser did not comply with uniform appraisal standards and did not use the proper methodology to appraise the Golf Course Property and Development Property.

As real estate values continue to decline, this deficiency will only continue to escalate, further jeopardizing the Mortgagees' security interest.  See In re Kessler, 76 B.R. 434, 438 (Bankr. E.D. Pa. 1987) (holding that: "We believe that it is a fair statement that, if a debtor has failed to make payments to his mortgagee, and is unable to articulate any particular circumstances which render the mortgagee adequately protected in spite of this fact, then relief from the automatic stay should follow").  Considering the glaring lack of equity in the Mortgaged Properties and the Debtors' inability to provide any measure of protection to the Mortgagees, relief from the automatic stay must be granted.  The Mortgagees should <u>not</u> be exposed to further dissipation of their collateral while the Debtors seek to further delay the inevitable liquidation of their asset.

### C.    <u>Mortgagees Are Entitled To Relief From The Automatic Stay Pursuant to 11 U.S.C. § 362(d)(2).</u>

Section 362(d)(2) of the Bankruptcy Code also permits relief from the automatic stay if (i) a debtor does not have equity in the property, and (ii) such property is not necessary to an effective reorganization.  11 U.S.C. § 362(d)(2).  See In re Pegasus Agency, Inc., 101 F.3d 882,

886 (2d Cir. 1996); In re Woodbranch Energy Plaza One, Ltd., 44 B.R. 733, 736 (Bankr. S.D.

Tex. 1984).  In this case, both elements have been satisfied.

As set forth in Point I A above, no equity exists in the Mortgaged Properties.  Because no

equity exists in the Golf Course Property or Development Property, the Debtors have no ability

for reorganization.

A debtor has the burden of proof of showing that if there is conceivably to be an effective

reorganization, the Mortgaged Properties will be needed for it, but also that the Mortgaged

Properties are essential for an effective reorganization.  This means that there must be "a

reasonable possibility of a successful reorganization within a reasonable time."  See In re

Pegasus Agency, Inc., 101 F.3d at 886 (citing United Savs. Ass'n of Tex. v. Timbers of Inwood

Forest Assoc., Ltd., 484 U.S. 365, 108 S.Ct 626, 98 L. Ed. 2d 740 (1988)); In re Cadwell's

Corners Partnership, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994) (When a creditor has shown that

its claim is unsecured, the debtor must prove that the property is needed for an effective

reorganization).

A debtor's high hope of reorganizing is not enough to continue the automatic stay over

property in which the debtor has no equity.  See In re Playa Dev. Corp., 68 B.R. 549, 554

(Bankr. W.D. Tex. 1986); In re Island Helicopter Corp., 63 B.R. 809, 816 (Bankr. E.D.N.Y.

1986) (citing In re Saypol, 31 B.R. 796 (Bankr. S.D.N.Y. 1983) ("The automatic stay will remain

operative only if the Debtor demonstrates that its prospects of an effective reorganization are

well founded...").  If reorganization is not reasonably possible, the mere fact that the property

may be indispensable to the debtor's hopes of reorganization will not justify a continuation of the

stay.  Terra Mar Dev. Corp. v. Terra Mar Assoc. (In re Terra Mar Assoc.), 3 B.R. 462, 466

(Bankr. D. Conn. 1980) (where the debtor failed to show that it could refinance its operations,

15

the court held that the debtor's collateral was not necessary to an effective reorganization, and vacated the stay); see also In re Boca Dev. Assoc., 21 B.R. 624, 630 (Bankr. S.D.N.Y. 1982) ("An 'effective' reorganization means more than just that the debtor needs the property").

Here, the Debtors have been in default of their financing obligations and have been unable to demonstrate, with any consistency, an ability to refinance their obligations.  The deepening credit crisis renders any prospect of securing replacement financing to satisfy the Mortgagees' secured debt extremely remote.  As demonstrated in detail in the McLain Reply Affidavit, the Debtors failed to take the necessary steps during the past two (2) years to materially advance their site approval application for the Development Property.  The Debtors have a number of critical requirements that they have to satisfy and successfully complete before they can proceed with their site approval application.  For example, the Debtors are required to: (i) pay the outstanding real estate taxes to the Borough; (ii) pay their engineer and architect for past due invoices and for the necessary services to complete the application process; (iii) address all of the open items requested by the Borough's engineer, which are set forth in a letter dated March 6, 2009; and (iv) comply with all of the terms of the Proposed Purchase Agreement including, but not limited to, the transfer of a certain parcel of the Golf Course Property to the Borough for the purpose of constructing a soccer field pursuant to a "land swap" agreement.  The Debtors have failed to achieve any of these requirements.[10]

The Debtors' failure to take the necessary steps to obtain final approvals from the Borough makes it extremely difficult for the Debtors to obtain any replacement financing as to the Development Property.  Moreover, even if the Debtors were able to proceed with their site

---

[10] The Debtors have failed to pay the professionals that are necessary to provide the services related to the site plan approval application.

plan approval application and obtain final approvals from the Borough, NextValue's

contemplated investment amount of $16 million will not satisfy the Mortgagees' secured debt

which currently exceeds $21 million.  Because the Debtors do not have a reasonable possibility

of reorganization, the Court should not permit the Debtors to proceed with their Chapter 11

proceedings to the substantial detriment of the Mortgagees.  Accordingly, the Court should grant

the Mortgagees' motion for relief from the automatic stay.

> **D.    RVCC's Receipts And Revenues Constitute The
> Mortgagees' Collateral And Therefore The Debtors
> Have No Source Of Income To Fund These
> Proceedings.**

Contrary to the Debtors' contentions, PRIF's Assignment of Rents specifically provides

that "all rents, income and profits for the use, enjoyment and occupation of the [Mortgaged]

Property" are included in the definition of "Rents."  (See PRIF's Assignment of Rents, p. 1,

Exhibit A to McLain Reply Aff.)  The income and profits generated by the Golf Course Property,

therefore, constitute "rents" pursuant to PRIF's Assignment of Rents which have been pledged

and assigned to PRIF pursuant to the express terms of the Assignment of Rents.  The Debtors'

narrow reading of PRIF's Assignment of Rents is unsupportable and contrary to the express

terms of the controlling agreement between the parties.  The Debtors have also failed to cite to

any controlling authority that holds that green fees and other receipts generated by a golf course

do not constitute "rents" pursuant to a written assignment of rents.

Even if the receipts of the Golf Course Property do not constitute "rents" pursuant to the

Mortgagees' Assignment of Rents, the Mortgagees unquestionably hold a valid security interest

in all of the Debtors' assets including their cash receipts and revenue.  On page 14 of the

Debtors' Brief, Debtors incredulously contend that they did not grant a security interest to the

Mortgagees in the revenues and receipts of RVCC.  That statement is absolutely false and in

direct contravention of the controlling security agreements between the Mortgagees and Debtors.

Pursuant to Section 1 of the Security Agreement, the Debtors expressly assigned and

pledged to PRIF "a security interest in, and lien upon, all of Debtor's right, title and interest in

and to those assets of Debtor more particularly set forth on <u>Exhibit "A"</u> attached hereto (the

"Collateral")."  Exhibit A to the Security Agreement contains a list of virtually all of the

Debtors' assets and property including, but not limited to, accounts receivable, chattel paper,

deposit accounts, equipment, financial assets, general intangibles, inventory, investment

property, letters of credit and proceeds.  In fact, the term "Proceeds" is defined in Exhibit A to

the Security Agreement, as follows:

> "<u>Proceeds</u>" shall mean, in addition to the definition thereof
> contained in the UCC, all proceeds of any and all of the foregoing
> Collateral (including, without limitation, (A) **all rights of Debtor
> to receive monies due and to become due under or pursuant to
> any Collateral**, and (B) all payments under insurance (whether or
> not Secured Party is the loss payee thereof), or any indemnity,
> warranty or guaranty, payable by reason of loss or damage to or
> otherwise with respect to any of the foregoing Collateral).

(<u>See</u> Exhibit A to Security Agreement, McLain Reply Aff., Exh. A.)

The Debtors' contention that the Mortgagees' loan documents do not provide a specific

granting of a security interest in RVCC's receipts, cash or revenue is simply absurd, considering

the detailed description of PRIF's collateral set forth in the Security Agreement.  <u>See</u> <u>N.J.S.A.</u>

12A:9-108 (titled "Sufficiency of Description," this section of the Uniform Commercial Code

provides that "a description of personal or real property is sufficient, whether or not it is specific,

if it reasonably identifies what is described").  In fact, the case relied on by Debtors for the

proposition that the Debtors did not grant a security interest in specific collateral, <u>First County</u>

<u>National Bank And Trust Company v. Canna</u>, 124 N.J. Super. 154, 157 (App. Div. 1973),

actually supports the Mortgagees' valid security interest in the Debtors' receipts and revenues.

That case specifically recognized that an agreement creating a security interest is valid and

enforceable if it contains clear language indicating the debtor's intent to grant the secured

creditor a security interest in its assets.  See id.  There is no question that the Debtors' expressly

granted to the Mortgagees a security interest in all of the specific collateral identified in the

controlling security agreements and UCC-1 Financing Statements including "**all rights of the**

**Debtor[s] to receive monies due and to become due**" to the Debtors.  (See Exhibit A to

Security Agreement, McLain Reply Aff., Exh. A.)  The Debtors' argument that the UCC-1

Financing Statements are not enforceable because they are not signed by the Debtors has no

merit whatsoever, considering the Debtors executed and delivered written Security Agreements

in favor of the Mortgagees.[11]

On November 2, 2206, PRIF perfected its security interest in the Debtors' assets by filing

a UCC-1 Financing Statement with the New Jersey Department of Treasury.  (See PRIF's UCC

Financing Statement, McLain Reply Aff., Exh. B.)  PRIF's UCC-1 Financing Statement

---

[11] The Debtors also improperly cite to N.J.S.A. 12A:9-203 for the proposition that a
UCC-1 financing statement must be signed by the Debtors.  N.J.S.A. 12A:9-203 provides the
requirements for enforceability of a security agreement including the execution of a written
security agreement signed by the debtor which contains a description of the subject collateral.
N.J.S.A. 12A:9-203 does not require a debtor to sign the UCC-1 financing statements, which do
not contain a signature line for the debtor.  The Uniform Commercial Code does not require a
debtor to sign a UCC-1 financing statement.  See In re Maple Contractors, Inc., 172 N.J. Super.
348, 354 (Law Div. 1979) (recognizing that former section N.J.S.A. 12A:9-402(a) of the
Uniform Commercial Code, which has been repealed, required a debtor to sign a UCC-1
financing statement).  The Debtors clearly executed written Security Agreements that identify
the Mortgagees' collateral and the Mortgagees properly filed UCC-1 financing statements.  (See
McLain Reply Aff., ¶ 10-11.)

expressly provides that the financing statement covers "all assets of Debtor, including, without limitation, the collateral described on Schedule A attached hereto and made a part hereof."[12] Id.

In addition, the Debtors executed and delivered a Mortgage and Security Agreement dated November 1, 2006, ("Mortgage and Security Agreement"), in favor of P II.  (See Mortgage and Security Agreement, McLain Reply Aff., Exh. C.)  Pursuant to the express terms of the Mortgage and Security Agreement, the Debtors granted and conveyed to P II a security interest in all of the Debtors' assets and property.  (See Mortgage and Security Agreement, McLain Reply Aff., Exh. C.)  On November 17, 2006, P II filed a UCC-1 Financing Statement with the New Jersey Department of Treasury to perfect its security interest in the Debtors' assets and property.  (See P II's UCC-1 Financing Statements, McLain Reply Aff., Exh. D.)

P II's UCC-1 Financing Statements expressly provide that the Debtors grant to a P II a blanket security interest in "all of Debtor[s'] title and interest in and to all tangible goods, chattels, fixtures, furniture, machinery, equipment and property of Debtor[s] used in and necessary to the operation of the building(s) and structure(s) including, without limitation, all carpets, furniture, furnishings… **and all cash and non-cash proceeds thereof**." Id.  Because P II's UCC-1 Financing Statements expressly identify "all cash and non-cash proceeds" of the Debtors, there is no question that P II holds a valid and perfected security interest in the Debtors' cash receipts and revenues.[13]  Considering the Mortgagees hold valid security interests in the

---

[12] Schedule A to PRIF's UCC-1 Financing Statement is identical to Exhibit A of the Security Agreement.

[13] P II's UCC-1 Financing Statements cannot be any clearer on the intent of the Debtors to grant to P II a security interest in their cash and non-cash proceeds.  There simply is no controlling authority that requires the security agreement or UCC-1 to identify the specific and multiple revenue lines (i.e., green fees, golf cart, golf equipment of golf apparel) that constitutes the secured lender's collateral.  To do so would substantially restrict the scope of the creditor's (continued…)

Debtors' receipts and revenues, the Debtors should <u>not</u> be permitted to use the Mortgagees'

collateral.

**1.      <u>Under 363 of the Bankruptcy Code, the Debtors
May Not Use the Cash Collateral Without
Mortgagees' Consent And Debtors Cannot Meet
Their Burden of Establishing That Mortgagees
are Adequately Protected.</u>**

As a result of the Mortgagees' first priority senior perfected security interest and liens in

substantially all of the Debtor's assets, including any income generated by the Golf Course

Property and operations, any receipts and cash generated by the Golf Course Property is the

Mortgagees' cash collateral.  The cash collateral may not be used by the Debtors without the

consent of the Mortgagees or an order of the Court pursuant to Section 363(c)(2) of the

Bankruptcy Code.  Section 363(c)(2) provides, as follows:

> The [debtor-in-possession] may not use, sell or lease cash
> collateral under paragraph (1) of this subsection unless -
>
> (A)  each entity that has an interest in such cash collateral
> consents; or
>
> (B)  the court, after notice and a hearing, authorizes such use, sale
> or lease in accordance with the provisions of this section.

<u>See</u> U.S.C. § 363(c)(2).

Under section 363(c), the Debtors may obtain court approval to use cash collateral only

upon showing that Mortgagees' interest in its collateral is "adequately protected."  11 U.S.C. §

363(e) ("at any time…the court, with or without a hearing, shall prohibit or condition such

use…as is necessary to provide adequate protection of such interest").  If adequate protection

_____

(…continued)
security interest in the Debtors' revenues and contradict the policies of the Uniform Commercial
Code.

cannot be offered, the Debtors must be prohibited from using the cash collateral.  See In re

Heatron, 6 BR. 493, 495 (Bankr. W.D. Mo. 1980); In re Metromedia Fiber Network, Inc., 290

B.R. 487, 491 (Bankr. S.D.N.Y, 2003); 3 Collier on Bankruptcy, § 363.05 (3d ed., Revised 2005)

("[I]f a trustee seeks to use cash collateral and cannot obtain the consent of the entity with an

interest in the collateral, adequate protection must be furnished before the cash collateral can be

used.").

Adequate protection, in its most basic terms, is that which reimburses a creditor for

decreases in the value of its interest caused by the imposition of the automatic stay, or the use of

cash collateral by the debtor:  "The whole purpose of adequate protection for a creditor is to

insure that the creditor receives the value for which he bargained prebankruptcy."  In re

Swedeland Dev. Group. Inc., 16 F.3d 552, 564 (3d Cir. 1994) (quoting In re O'Connor, 808 F.2d

1393, 1396 (10th Cir. 1987) (emphasis added); see also In re Martin, 761 F.2d 472, 476 (8th Cir.

1985).  Section 361 of the Bankruptcy Code details three non-exhaustive ways in which adequate

protection may be provided:

> (1)  requiring the [debtor-in-possession] to make a cash payment or
> periodic cash payments to such entity, to the extent that the…use,
> sale or lease under Section 363 of this title…results in a decrease
> of the value of such entity's interest in such property;

> (2)  providing to such entity an additional or replacement lien to
> the extent such stay, use, sale [or] lease or grant results in a
> decrease in the value of such entity's interest in such property; or

> (3)  granting such other relief, other than entitling such entity to
> compensation allowable under Section 503(b)(l) of this title as an
> administrative expense, as will result in the realization by such
> entity of the indubitable equivalent of such entity's interest in such
> property.

See 11 U.S.C. § 361.

22

To be permitted to use the cash collateral, the Debtors must make compensatory payments to the Mortgagees, provide additional or replacement liens, and/or provide the Mortgagees with the indubitable equivalent of its interest in the Mortgaged Properties to insure that Mortgagees "receives the value for which [they] bargained prebankruptcy."  Swedeland Dev. Group, Inc., 16 F.3d at 564; accord In re Republic Tech. Intern., L.L.C., 267 BR. 548, 554-55 (Bankr, N.D. Ohio 2001) (holding that a creditor is entitled to that amount of adequate protection which would enable it to receive the benefit of its bargain); In Re Hart Ski Mfg. Co., Inc., 9 B.R. 397, 400 (Bankr. D. Minn. 1981) ("The secured creditor is entitled to the indubitable equivalent or full benefit of its bargain.").

The Debtors have the burden of establishing adequate protection.  See 11 U.S.C. § 363(p)(1) ("the [debtor in possession] has the burden of proof on the issue of adequate protection"); see also Swedeland Dev. Group, Inc., 16 F.3d at 564.  The Debtors, not the Court, must frame the adequate protection package and prove that it adequately protects the secured creditor from any diminution of the value of its collateral.  See In re Blehm Land and Cattle Co., 859 F.2d 137 (10th Cir. 1988).

It is also well established that cash is the highest, best and most secure form of collateral. See In re Berens, 41 B.R. 524, 527 (Bankr. D. Minn. 1984) ("if the Debtor is allowed to use the cash collateral the creditors' security - the collateral - is gone").  In addition, a secured creditor's cash collateral should not be used, and its priority position eroded, based on mere speculation or hope that a debtor may be able to turn its business around.  See Swedeland Dev. Corp., 16 F.3d at 567 ("Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects."); In re Mosello, 195 B.R. 277, 293 (Bankr.

23

S.D.N.Y. 1996) (holding speculative benefit to undersecured creditor if debtor were able to develop certain real property was not adequate protection for use of secured creditors' collateral).

The Debtors' cross-motion for use of cash collateral should be denied.  The Debtors' contention that RVCC's monthly revenues are sufficient to pay monthly debt service to the Mortgagees is absurd and completely ignores the fact that the Debtors have not made a debt service payment to PRIF in over 26 months.  (See McLain Aff., ¶ 25.)  As demonstrated in detail in the Receiver's Affidavit, during the period of January 2009, through December 2009, RVCC collected approximately $2,871,050 in gross receipts, and paid approximately $2,744,054 in operating expenses.  Those expenses did not include any debt service payments to the Mortgagees.  Based on the 2009 summary of gross receipts and disbursement of expenses, the Debtors have no ability to provide debt service payments to the Mortgagees.

In fact, the Receiver is currently holding approximately $80,000 in its operating account which will be depleted within the next few weeks to pay payroll and necessary operating expenses of RVCC.  The Debtors also conveniently ignore the fact that there are outstanding real estate taxes of $109,206.05 which have priority over the Mortgagees' secured debt.  The Bankruptcy Code does not sanction dissipating a secured creditor's collateral when it is evident that the Debtors do not have the ability to reorganize.  Accordingly, the Debtors' cross-motion for use of the Mortgagees' cash collateral should be denied as the Mortgagees should not be required to watch the value of their collateral to be further jeopardized in this difficult and uncertain credit and real estate market.

**2.    There Is No Equity Cushion To Support The Debtors' Request For Use Of Cash Collateral.**

An equity cushion has been defined as "the value in the property above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in

value of the property during the time the automatic stay remains in effect." In re Melior, 734

F.2d 1396, 1400 n.2 (9th Cir. 1984).  Here, there is no equity cushion in the Golf Course

Property or Development Property to support the Debtors' cross-motion for use to the

Mortgagees' cash collateral.  As demonstrated in Point I A above, the current fair market value

of the Mortgaged Properties are less than their September 2006 valuations of $15 million for the

Golf Course Property and $3.3 million for the Development Property.  Because the value of the

Mortgagees' secured debt currently exceeds $21 million (and there are unpaid real estate taxes of

$109,206), there simply is no equity available in the Mortgaged Properties to adequately protect

the Mortgagees' secured interests.

        In addition, the Debtors' argument that the Borough's issuance of final approvals for the

Development Property will substantially increase the value of the Development Property is based

on mere speculation with no support based on current comparables of vacant development

properties.  Moreover, because the Debtors have failed to address the strict requirements and

conditions that must be satisfied before the Debtors could proceed with their site plan approval

hearing before the Borough (which will cost substantial dollars and time to complete), the

likelihood of successfully obtaining final approvals from the Borough is very small.

Furthermore, the inadequacy of any equity cushion will only be exacerbated as it is eroded

through accruing and unpaid post-petition interest if the Debtors are not required to make cash

payments of interest at the default contract rate.

        Based on the controlling authorities set forth herein, the Debtors clearly have no

ownership interest in the income derived from the Golf Course Property and cannot use that

income as cash collateral to fund their operating expenses.  Accordingly, the Court should deny

the Debtors' cross-motion for declaration that the Mortgagees do not hold a security interest in

the Debtors' receipts and revenues or, alternatively, use of cash collateral pursuant to 11 U.S.C. §

363 to pay the ordinary and necessary operating expenses of the Debtors.

### III.    THE RECEIVER SHOULD BE PERMITTED TO CONTINUE THE MANAGEMENT AND OPERATION OF THE GOLF COURSE PROPERTY AND BE EXCUSED FROM COMPLIANCE UNDER SECTION 543(d)(1) OF THE BANKRUPTCY CODE.

This Court should excuse the Receiver from any obligation to release to the Debtors'

estate any receipts and assets within its control pursuant to Section 543(d)(1) of the Bankruptcy

Code.  As explained above, the funds in the Receiver's custody constitute the Mortgagees'

assets, not the assets of the Debtors and, therefore, the Receiver is under no obligation to release

the funds to the Debtors.  In the unlikely event the Court were to determine that the receipts

generated from the Golf Course Property constitutes assets of the Debtors' estate (which is

clearly not the case), the Receiver should nonetheless be excused from compliance and be

permitted to continue his management and operation of the Golf Course Property.

Section 543(d)(1) of the Bankruptcy Code provides that the bankruptcy court may, in its

discretion, excuse a custodian's compliance with the Turnover Provisions "if the interests of

creditors…would be better served by permitting a custodian to continue in possession…of such

property."  11 U.S.C. § 543(d)(1); Dill v. Dime Sav. Bank, FSB (In re Dill), 163 B.R. 221, 225

(E.D.N.Y. 1994).  Critically, the interests of the debtor are not relevant to the determination of

whether to except a custodian from the Turnover Provisions.  French Bourekas, Inc. v. Turner,

199 B.R. 807, 819 (E.D.N.Y. 1996); Dill, 163 B.R. at 224 ("the interests of the Debtor, however,

are not part of the criteria considered when applying section 543(d)(1).  Rather, courts

considering whether to excuse a receiver from the Turnover Provisions under Section 543(d)(1)

have looked to several factors to decide whether the interests of creditors would be better served

by the continuation of the receiver.  Those factors include the following:

26

(1) whether there will be sufficient income to fund a successful reorganization;

(2) whether the debtor will use the property in question for the benefit of the creditors;

(3) whether there has been mismanagement by the debtor;

(4) whether or not there are avoidance issues raised with respect to the property (because the receiver does not possess avoiding powers for the benefit of the estate); and

(5) the fact that the automatic stay had deactivated state court receivership action.

In re Constable Plaza Assocs., L.P., 125 B.R. 98, 103-104 (Bankr. S.D.N.Y. 1991); Dill, 163 B.R. at 225.  Courts also consider the quality of the receiver's performance in deciding Section 543(d)(1) motions.  In re KCC-Fund v. Ltd., 96 B.R. 237, 240 (Bankr. W.D. Mo. 1980); see also In re Sundance Corp., 83 B.R. 746, 749 (Bankr. Mont. 1988) (continuing receiver who court found "ably performed his duties").

Application of the relevant factors support excusing the Receiver from the Turnover Provisions.  First, the Debtors lack sufficient income to fund a successful reorganization.  The Debtors' sole source of income is derived from the Golf Course Property which constitutes the Mortgagees' collateral pursuant to the Assignment of Rents, Security Agreements and UCC-1 Financing Statements.  Those receipts and revenues, therefore, are not property of the Debtors' estates under Section 541(a) of the Bankruptcy Code and cannot be used by the Debtors (and their professionals) to fund their purported reorganization effort.  Those funds are also unavailable for the benefit of creditors.

It is in the best interest of creditors and the estates that the Receiver remain in possession and control of the Mortgaged Properties and continue to collect the receipts and revenues of the Golf Course Property during the pendency of these proceedings.  The Receiver has successfully

27

managed and operated the Mortgaged Properties for the past eighteen (18) months and has

consistently collected all receipts and ensured that the Mortgaged Properties are properly

maintained.  The Receiver and his management group have expended considerable time and

effort during the past fourteen (14) months in resolving the Debtors' past due invoices owed to

key vendors and suppliers and developing and implementing an effective financial management

system that is critical to the operations of the golf course.  The Receiver and his management

group have acquired considerable knowledge regarding the operations of the golf club and have

improved the club's relations with essential vendors and suppliers.  (See Sinisi Aff. ¶16).  A

change in the court-appointed manager of the Golf Course Property, and the resulting time

required for a new management team to become familiar with the club and its vendors, could

result in both a delay in the opening of the club for the 2010 season and impair the viability and

operations for the 2010 season.

      Moreover, the Debtors and their principal (Keh) have demonstrated a propensity to

engage in disruptive and malicious conduct specifically designed to interfere with the Receiver's

management and operation of the Golf Course Property.  (See McLain Reply Aff., ¶ 42-52.)  Keh

grossly mismanaged the Golf Course Property before the Receiver's appointment leaving

substantial accumulated invoices owed to critical vendors and suppliers of the golf club.  But for

PRIF's protective advance payment of $92,000 on February 13, 2009, to fund critical operating

expenses, the golf club would not have opened for the 2009 golf season.  (See Young Aff., ¶ 7.)

      In addition, the Debtors and Keh have attempted to divert the Golf Course Property's

receipts in blatant violation of the Receiver's directions.  For example, Keh deliberately violated

the Receiver's First Order requiring Keh to obtain the Receiver's consent for any payment is in

excess of $1,000.  Keh issued numerous checks in access of $1,000 in violation of Receiver's

directives including a $75,000 check for an alleged commitment fee to Fundex, which never resulted in a refinancing of the Mortgagee's outstanding loans as promised by Keh. Shortly after the Receiver's appointment, Keh failed to deposit cash receipts into the golf club's operating account in an attempt to divert the cash proceeds generated by the Golf Course Property. While $270,000 was deposited into the golf club's checking account at Oritani Bank during the month of October 2008, not one dollar of cash was deposited into the golf club's operating account and/or checking account.  (See McLain Reply Aff., ¶ 47.)

In addition, the Debtors and Keh have attempted to implement management decisions without the Receiver's approval to the substantial detriment of golf course operations and its profitability. For instance, in the Summer and Fall of 2009, Keh unilaterally closed the golf club on a Saturday or Sunday afternoon, approximately five (5) times, to host Korean golf outings at RVCC at the expense of the club's members and public golfers. Keh scheduled his Korean golf outings without the Receiver's consent and approval. Keh also provided substantial reduced green fees to those participating in his weekend Korean outings, which resulted in substantial losses to RVCC in weekend revenues.

Keh has demonstrated a propensity to orchestrate fraudulent schemes on third-parties which have been the subject to several pending lawsuits against Keh and the Debtors. Keh's proclivity of engaging in intentional bad acts and bad faith warrant the granting of the Mortgagees' application to excuse the Receiver from compliance with Section 543(d)(1) of the Bankruptcy Code.

## <u>CONCLUSION</u>

The Debtors improperly seek to use this Chapter 11 proceeding to delay the Mortgagees' absolute right to proceed with their foreclosure sale of the Mortgage Properties.  Because the Debtors have no possibility of reorganization and a continuation of this proceeding will result in an administratively insolvent estate, the Court should dismiss the Debtors' petitions.  In the event the Court has any questions regarding the current fair market value of the Mortgage Properties, the Court should conduct an evidentiary hearing before permitting this Chapter 11 case to proceed to the substantial risk of the Mortgagees.  For all of the foregoing reasons, the Mortgagees respectfully request that the Court enter an Order: (a) dismissing the Debtors' Chapter 11 petitions pursuant to 11 U.S.C. § 1112(b) or, alternatively, (b) granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d); (c) excusing the Receiver from compliance under 11 U.S.C. § 543(d); and (d) prohibiting, to the extent applicable, the Debtors from use of cash collateral pursuant to 11 U.S.C. § 363(c)(2) and (e).  The Court should also deny the Debtors' cross-motion to approve the Advance Agreement and for use of cash collateral.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for PRIF II Chemtek, LLC and P II
River Vale GC Funding, LLC


By:___*/s/ Leo V. Leyva*_____
        Leo V. Leyva
        James T. Kim

DATED:  March 11, 2010

30